Luis López Vázquez et al., demandantes y recurridos, *v.* Hospital Presbiteriano, Inc., et al., demandados y recurrentes.

*Número:* R-76-300    *Resuelto:* 10 de mayo de 1978

198

*William Estrella, Luis A. Román, Igor Domínguez,* abogados del Hospital Presbiteriano, Inc.; *Agraít, Otero, Oliveras & Collazo,* abogados de Maryland Casualty Company; *Wilfredo A. Géigel,* abogado de los recurridos.

EL JUEZ ASOCIADO SEÑOR TORRES RIGUAL emitió la opinión del Tribunal.

Trata este caso de una reclamación de daños fundada en la negligencia profesional de un médico y de un hospital por tratamiento inadecuado a un niño recién nacido afectado por una infección de tétano.

La controversia gira en torno a dos cuestiones fundamentales: 1) la suficiencia de la prueba con respecto a los hechos en que se funda la determinación de negligencia, y 2) con respecto a la relación causal de los daños con tales hechos.

El pleito se inició en mayo de 1966 por los padres del menor Eric López Luna, y no fue hasta diez años más tarde, en julio de 1976, que el tribunal de instancia dictó sentencia en la que declaró con lugar la demanda en contra del Hospital Presbiteriano, Inc. y su aseguradora Maryland Casualty Company. No impuso, sin embargo, responsabilidad al médico demandado Dr. Rafael Nieves.

El tribunal condenó al Hospital Presbiteriano a pagar la cantidad de $539,648.22 distribuida en las siguientes partidas:

1) A Luis López Vázquez y Margarita Luna Vázquez, padres de Eric por concepto de sufrimientos y angustias mentales la cantidad de ...................... $150,000.00

2) A Eric por el mismo concepto ........ 75,000.00

3) Por los gastos extraordinarios que se incurran para atención y cuidado de Eric durante su vida .......................... 101,830.00

4) Por la pérdida de ingresos futuros de Eric .............................. 163,418.85

5) A la señora López por los ingresos dejados de percibir ......................... 39,399.37

6) Para honorarios de abogado más las costas e intereses a partir de la notificación de la sentencia .......................... 10,000.00

Ambas partes interpusieron sendos recursos de revisión. El recurso interpuesto por los esposos López Luna se funda en que se limitó indebidamente a la cantidad de $163,418.85 la partida por concepto de pérdida de ingresos futuros de Eric y que se concedieron intereses a partir de la notificación de la sentencia en vez de la fecha de presentación de la demanda original en el 1966. En el recurso del Hospital Presbiteriano se señalan treinta errores, pero consideraremos solamente los relativos a los hechos en que se funda la negligencia y la relación de causalidad.

Eric López Luna nació en el Hospital Presbiteriano el 15 de diciembre de 1965. A solicitud de los esposos López Luna fue atendido por el Dr. Rafael Nieves, pediatra amigo de la familia, quien le practicó una circuncisión. El 18 de diciembre fueron dados de alta la madre y el niño y se trasladaron a Comerío a casa de los abuelos maternos en lo que la madre recuperaba. En los alrededores de esta casa existía un río donde se lanzaba basura y pastaban animales diariamente, según lo estableció el tribunal de instancia en las conclusiones de hechos.

Al llegar a Comerío el niño se quedó dormido pero se despertó al rato llorando, se mostraba intranquilo, siguió así el resto del día y los días siguientes hasta el día 22 de diciembre cuando la madre notó que tenía secreciones nasales. Ese día, o al día siguiente la señora López aprovechó que tenía que venir a San Juan a cortarse los puntos y llamó por teléfono al Dr. Nieves indicándole que el niño tenía catarro y

secreciones. (¹) El Dr. Nieves le recetó fenergan pediátrico, gotas y aconsejó que le pusieran un vaporizador. Ese día al tratar ella de darle la medicina notó que el niño se trancó, que al meterle el gotero no le cedía la boquita. El día 24 de diciembre el niño había empeorado por lo que llamó de nuevo al Dr. Nieves informándole que el niño lloraba mucho, estaba ya asfixiado, con muchas secreciones, respirando con dificultad, se trincaba y cuando lo tomaba en los brazos encogía las piernas. La abuela notó que el niño estaba un poco rígido en el cuello. Al llegar el padre de su trabajo en Guánica, a eso de las 9:00 de la noche, llamó de nuevo al Dr. Nieves y éste le indicó que le llevaran inmediatamente al niño, pero el padre decidió esperar el día siguiente porque estaba lloviendo. Llevaron el niño a la casa del Dr. Nieves el 25 de diciembre cerca de las 8:00 de la mañana. Tan pronto el Dr. Nieves lo examinó hizo un diagnóstico tentativo de tétano y recomendó su inmediata hospitalización. En la casa del Dr. Nieves el niño sufrió un espasmo y se puso negro. Llamaron al Hospital del Maestro pero no lo quisieron aceptar, luego llamaron al Hospital Presbiteriano donde fue admitido proveyéndosele un cuarto especial en la Sección de Pediatría por indicación del Dr. Nieves.

Durante los primeros cinco días de hospitalización el niño sufrió espasmos y convulsiones por dos minutos, cinco minutos, diez minutos, y, en una ocasión, el 27 de diciembre sufrió una de 45 minutos, según nota en el récord del Dr. Valedón. El niño se veía cianótico y tenía coloración morada de la piel.

El primero de enero de 1966 la señora López notó que Eric no estaba respirando bien y llamó una enfermera que acudió a la habitación y le acomodó una almohada en la espalda para cambiarlo de posición. Se volvió a llamar a la

---

(¹) En su testimonio la madre declaró que la llamada al Dr. Nieves fue el 22 de diciembre pero en la contestación a la pregunta Núm. 4 del interrogatorio escrito informó que la llamada había sido el 23 de diciembre.

enfermera y se hicieron las gestiones para conseguir al Dr. Nieves, quien llegó, según las conclusiones del tribunal, aproximadamente hora y media después. Se le dio entonces tratamiento de emergencia, respiración artificial de boca a boca, masaje cardíaco, aplicación de adrenalina, cafeína, decadrón y se le colocó un tubo endotraqueal para mantener las vías respiratorias abiertas. El pronóstico, según nota del Dr. Nieves, era pobre debido a la sospecha de anoxia cerebral. En los días siguientes Eric sufrió siete fallos respiratorios, el tubo endotraqueal se le ponía y se le sacaba, pero en muchas ocasiones el récord no revela quien daba las órdenes. Eric mejoró de su condición respiratoria, pero se complicó su condición con otras bacterias, y, el 31 de enero un examen de rayos X indicó que sufría neumonía por aspiración. El 21 de febrero Eric es transferido al Hospital Universitario para continuar tratamiento donde continúa hospitalizado hasta el 8 de mayo de 1966. Posteriormente Eric fue evaluado y tratado por varios especialistas para determinar su desarrollo intelectual concluyéndose que sufría de retardación mental severa.

Los esposos López Luna instaron demanda contra el Hospital Presbiteriano en mayo de 1966. Posteriormente enmendaron la demanda en tres ocasiones, incluyendo al Dr. Nieves por primera vez como demandado en la cuarta demanda presentada siete años más tarde, en mayo de 1973.

I

El tribunal concluyó que Eric sufrió una hipoxia cerebral, no como consecuencia del tétano y sí como consecuencia de la anoxia o falta de oxígeno que sufriera el primero de enero de 1966; que el tratamiento no fue el más adecuado ni siguió las normas de la buena práctica de la medicina ya que los síntomas que de día a día él presentaba, desde el 25 de diciembre hasta el primero de enero de 1966, demostraban que no estaba llegando oxígeno al cerebro en cantidad ade-

cuada y no se tomaron las medidas pertinentes para evitar el episodio del primero de enero de 1966.

El tribunal concluyó, además, que no se observaron las normas de la buena práctica de la medicina, tales como: 1) el abrir un paso de aire por las vías respiratorias utilizando el procedimiento de traqueotomía o el de una entubación endotraqueal, 2) el no haber limitado la presencia de personas en la habitación a aquellas responsables del mantenimiento de la criatura, 3) el no tener personal debidamente adiestrado las veinticuatro horas del día velando por que no ocurrieran fallos cardíacos y respiratorios, y 4) el no cumplir estrictamente las instrucciones del médico.

Consideraremos cada una de estas conclusiones a la luz de la prueba desfilada.

1. La utilización de un tubo endotraqueal o una traqueotomía en un niño recién nacido afectado por una infección de tétano, como es el de este caso, es cuestión esencialmente técnica que requiere para su dilucidación el examen de la prueba pericial desfilada, respecto a la cual estamos en plena libertad de aquilatar su eficacia y valor probatorio. *Prieto* v. *Maryland Casualty Co.*, 98 D.P.R. 594 (1970).

El tribunal de instancia adoptó la opinión del Dr. Andrés L. Oliver, perito de los demandantes López Luna al efecto de que debió practicarse una traqueotomía o haberse entubado al niño desde el mismo día que fue hospitalizado el 25 de diciembre, ya que los síntomas demostraban que no estaba llegando oxígeno al cerebro en la cantidad que debía llegar.

Al respecto el Dr. Oliver afirmó que en todo caso de tétano debe procederse, como cuestión de rutina, a una entubación endotraqueal o a una traqueotomía. T.E., vol. I, pág. 353. Puntualizó que desde un principio debió utilizarse la traqueotomía o la entubación, *Id.* a la pág. 388; que él hubiese procedido a la entubación aunque no hubiese dificultad respiratoria. *Id.* vol. II, págs. 164–165. También expresó que

el uso de una máquina hiperbárica formaba parte del trata-
miento adecuado, *Id.* vol. I, págs. 365, 388; que esta máquina
y el equipo de entubación debían estar disponibles en la habi-
tación. *Id.* a la pág. 372.

Sin embargo, al ser confrontado con la opinión contraria
de una de las autoridades más reconocidas en pediatría—
Nelson *Textbook of Pediatrics*—se limitó a expresar que es-
taba en desacuerdo con dicho texto pero no adujo fundamento
científico alguno para sostener su juicio. *Id.* vol. II, págs. 202,
257. Con respecto al uso de la máquina hiperbárica admitió
en el contrainterrogatorio que no sabía si para el 1966 exis-
tía en Puerto Rico dicha máquina. *Id.* págs. 170–172.

El Dr. Nieves, por el contrario, declaró que el tubo en-
dotraqueal está contraindicado en el caso de infantes y que
sólo se utiliza cuando surgen dificultades respiratorias debido
a que puede producir espasmos de la laringe y de la tráquea.
T.E., vol. V, págs. 70–71; que él utilizó el procedimiento de
poner al niño en una casita de oxígeno húmedo (*crouppet*)
que es el método adecuado en pediatría para tener oxigenado
a un infante como Eric con oxígeno húmedo. *Id.* Igualmente
declaró que la traqueotomía está contraindicada en un in-
fante de diez días de nacido porque activa la producción de
espasmos, *Id.* pág. 75; que utilizó el tubo endotraqueal cuan-
do lo consideró indicado clínicamente, o sea, cuando no hubo
más remedio. *Id.* pág. 81.

Las autoridades médicas que hemos examinado sostienen
la opinión del Dr. Nieves. Refiriéndose a las obstrucciones
respiratorias en casos de tétano en infantes nos dice Nelson:

"La tasa de mortalidad es mucho más alta en los casos de
infantes recién nacidos y los ancianos. La mayoría de las
muertes son precipitadas por las condiciones respiratorias, tales
como la obstrucción por secreciones, asfixia por espasmos de la
laringe, anoxia prolongada, atelectasia y pulmonía. El uso *caute-
loso* de la traqueotomía parece facilitar el manejo de estas com-
plicaciones." Nelson Vaughan McKay, *Textbook of Pediatrics,*
W. B. Saunders Company, ed. 1969.

Igual cautela recomienda el estudio publicado por el Departamento de Pediatría de la Universidad de Tulane en el Volumen 42 del *Journal of Pediatrics* a la pág. 347:

"Sin embargo, siendo la traqueotomía un procedimiento heroico en infantes la misma constituye un último recurso en pacientes críticamente enfermos, y difícilmente puede correlacionarse con la supervivencia del paciente. *Op. cit.* pág. 347.

. . . . . . . .

El riesgo de llevar a cabo cirugía en un infante críticamente enfermo es grande . . . La traqueotomía tiene un lugar en el manejo de pacientes individuales, *pero nunca debe practicarse como una cuestión de rutina.* Recurrimos a este procedimiento en el grupo de infantes siempre y cuando se obstruya la vía respiratoria debido a espasmos de la laringe, inhabilidad para tragar o no se pueda controlar la aspiración por otras razones." *Op. cit.* a la pág. 350. (Bastardillas nuestras.)

En cuanto al uso de la máquina hiperbárica advierte Shirkey, Harry C.: *Pediatric Therapy*, 3d ed., que:

"Contrario a lo que se esperaba, el uso de la máquina hiperbárica no es de valor comprobado en el tétano." A la pág. 412.

El récord médico indica que Eric presentaba episodios de espasmos, convulsiones, dificultades respiratorias, cianosis e intranquilidad, pero no de una obstrucción respiratoria que requiriera como parte de una buena práctica médica el administrarle un tubo endotraqueal o una traqueotomía.

Desde el mismo día que Eric entró al Hospital el Dr. Nieves dio instrucciones específicas sobre el tratamiento a seguir en los siguientes términos:

"LIC. AGRAIT:

P. ¿Qué tratamiento ordenó usted y que tratamiento se le dio en el Hospital Presbiteriano a este niño para su afección de tétano?

R. Una vez que llamé al Hospital Presbiteriano para comunicarles que tenía un caso de tétano neonatorum le dije que necesitaba una habitación privada; le dije que iba a enviarle un caso de un nene de diez (10) días de nacido con un diagnóstico

de tétano neonatorum y procedí a enviarlo con las órdenes médicas que se le imparten a un caso de esta naturaleza, a saber, ponerlo en un cuarto privado, hacerle el menor estímulo de ruido posible, mantenerlo en una habitación obscura o semi-obscura, hacerle un contaje de sangre, hacerle una prueba de orina, un cultivo de todas las áreas anteriormente expresadas; hacerle una flebotomía o cut-down, el cual hizo personalmente el Dr. Valedón, administración de suero intravenoso poner al paciente nada por boca; vigilarle sus signos vitales; pulso, respiración; temperatura; administración de tétano, que es la globulina tetánica al paciente además de administrarle penicilina acuosa intravenosa y el sedante." T.E., vol. V, págs. 60–62.

Al preguntarle el abogado de la recurrente por qué prefirió la casita de oxígeno al tubo endotraqueal y a la traqueotomía continuó la explicación sobre el tratamiento:

"TESTIGO:

R. Omití en la hoja de órdenes la casita de oxigenación, que es lo que se conoce como un crupet; tengo un niño de diez días con un diagnóstico tentativo de tétano neonatorum y descarto, en otras palabras, tener un niño con una hipersecresión nasal que viene aumentada por las contracciones espasmódicas como consecuencia del tétano. El problema de este niño en este momento es que hay que tenerlo en un ambiente húmedo, en un ambiente obscuro, o semi-obscuro, que se vea el niño y en un ambiente frío, el oxígeno húmedo va a dominar la viscosidad de las secreciones y por todo va a lubricar mejor las vías aéreas altas y bajas; al lubricarse resbalan mejor las secreciones, se pueden succionar, que es otra de mis órdenes, debe succionarse periódicamente, cuando así sea necesario; cuando se vea hipersecreciones de secreciones nasales u otofaringe para evitar que esta se obstruya; esta es la razón principal para ponerlo en una casita de oxígeno húmedo; además cuando el niño está tomando hay que tenerlo oxigenado para que no se produzca la cianosis y este es el medio adecuado en pediatría y en un infante, tenerlo oxigenado con oxígeno húmedo; tubo endotraqueal se pone cuando surge la dificultad; no podemos echar el coche antes que los caballos; hay que poner el tubo cuando surge la dificultad respiratoria; si yo pongo un tubo en un niño que está respirando bien, que tiene unos signos vitales adecuados y yo le meto un

tubo lo que voy a hacer es mantener un . . . cuando hay espasmo hay disminución de sangre en el cerebro, se sigue haciendo daño al cerebro al producirse la contracción al meter un tubo van a seguir las secreciones y va a ser una predisposición para producir un espasmo de laringe y tráquea." T. E., vol. V, págs. 68-71.

Salvo la opinión del Dr. Oliver en cuanto a la administración del procedimiento de traqueotomía y de la entubación endotraqueal a un niño recién nacido, no hay en el récord prueba para rebatir el tratamiento administrado por el Dr. Nieves porque fuera inadecuado o por no seguir las normas de una buena práctica médica. (²) Por otro lado, considerada la cuestión como un conflicto de opinión entre ambos peritos, la misma se reduce en última instancia a un error honesto de juicio. Como es sabido, se le reconoce al médico amplia discreción profesional y el error honesto de juicio no es fuente de responsabilidad civil. *Oliveros* v. *Abréu*, 101 D.P.R. 209 (1973).

El Dr. Nieves visitaba a Eric todos los días y, según el propio testimonio de la Sra. Luna, también lo visitaban cuando era necesario el Dr. Valedón, el Dr. Márquez, la Dra. Pérez y el Dr. Rullán, quien le hizo una laringoscopia. T.E., vol. I, págs. 158-159. Tanto el Sr. López como su esposa afirman no tener queja alguna de la atención que le brindó el Dr. Nieves a su hijo. *Id.* a las págs. 159, 214 y 275. A este respecto debe recordarse que no se demandó al Dr. Nieves en las primeras tres demandas presentadas por los diferentes abogados que representaron a los esposos López Luna en este caso. No es hasta transcurrido más de siete años desde la presentación de la primera demanda que se incluye por primera vez al Dr. Nieves. Más aún, el tribunal de instancia no impuso responsabilidad al Dr. Nieves aunque concluyó que el tratamiento médico no fue adecuado.

---

(²) Notamos en el récord que el Dr. Oliver apoyó su testimonio en algunos textos médicos que recomiendan la traqueotomía a la entubación endotraqueal en casos de tétano, pero ninguno de los textos trata específicamente el tratamiento de tétano neonatorum que es el que nos concierne.

■ La sentencia es inconsistente al eximir de responsabilidad al Dr. Nieves y, sin embargo, imponerle responsabilidad al Hospital Presbiteriano por los actos de aquél. Si el Hospital Presbiteriano responde como principal por considerar el tribunal que el Dr. Nieves actuaba como su empleado, lógicamente procedía también imponerle a éste responsabilidad por haber generado el acto o la omisión que causó el daño, en virtud de la obligación que dimana del Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141. En uno y otro caso el resarcimiento es consecuencia jurídica de un mismo acto negligente. No es propio, por tanto, eximir a uno e imponer responsabilidad al otro.

Por otro lado, el Dr. Nieves no actuó en su calidad de empleado del Hospital Presbiteriano sino que fue contratado directamente por los esposos López Luna en consideración a las relaciones de amistad que existía entre ellos. Así lo concluyó el tribunal de instancia en la sentencia recurrida.

En cuanto a este aspecto la sentencia es errónea desde cualquier posición que se le considere; bien desde el punto de vista del recurrente Hospital Presbiteriano, Inc., porque: 1) en el supuesto de que el tratamiento médico fuera inadecuado, el Dr. Nieves prestó sus servicios en virtud de un contrato privado con los esposos López Luna y no en su condición de empleado del Hospital, y, 2) en el supuesto de que pudiera considerarse al Dr. Nieves empleado del hospital procedía que también se le impusiera responsabilidad solidaria por los daños.

Desde el punto de vista de los esposos López Luna la sentencia es errónea porque se eximió de responsabilidad al Dr. Nieves no empece la conclusión del tribunal de que éste fue negligente y de que actuó en su condición de empleado del Hospital Presbiteriano.

■ Independientemente de estas inconsistencias lógicas, concluimos que la sentencia es errónea en tanto en cuanto la prueba es insuficiente para concluir que el tratamiento mé-

dico administrado por el Dr. Nieves a Eric fue inadecuado o contrario a las normas de la buena práctica de la medicina.

2. Otro elemento de negligencia determinado por el tribunal de instancia para imponer responsabilidad al Hospital Presbiteriano, Inc., es que se permitió a la madre del niño atenderlo sin estar debidamente entrenada ni emocionalmente capacitada para hacerlo; y que, además, se permitió la entrada de personas extrañas a la habitación para ver al niño.

No es correcto que el Dr. Nieves o el Hospital Presbiteriano delegaran en la señora López el cuidado de su hijo. El niño siempre estuvo al cuidado de las enfermeras. La presencia de la Sra. López en la habitación fue con el único propósito de observar al niño y notificar a las enfermeras y al Dr. Nieves los cambios en la respiración, color de la piel, si tenía secreciones o si se orinaba. T.E., vol. V, págs. 94–95. La práctica del Hospital Presbiteriano es que cuando el paciente no tiene recursos para sufragar el servicio de una enfermera especial se permite de observador a un familiar cercano. Véase declaración de la Sra. Rufina Aguirre, Directora del Departamento de Asistentes de Enfermera. *Id.* vol. III, pág. 319. Esta prueba no fue en forma alguna rebatida por los recurridos.

Aparece del récord también que el Dr. Nieves insistió en la necesidad de que los padres del niño obtuvieran los servicios de una enfermera especial permanentemente en la habitación:

"LIC. AGRAIT:

P. ¿Por qué no se utilizó en lugar de doña Margarita para esa labor, una enfermera en el cuarto en lugar de doña Margarita?

TESTIGO:

R. Lo que sucedió es que cuando hubo el día 1ro., cuando sucedió el fallo cardio-respiratorio, que después yo estuve largamente trabajando con Erick, cuando salí al pasillo afuera, los llamé a ellos, ellos es el padre y la madre, le expliqué la situación

actual, le dije lo que había sucedido, que lo que de ahí en adelante pudiera suceder no lo sabíamos, porque el niño había tenido una crisis cardio-respiratoria aguda, que a mi entender necesitábamos tenerle vigilancia constante, lo más posible al lado de su cama, en otras palabras, que consiguiera una enfermera, que se hiciera cargo, que hiciera ese trabajo; ya anteriormente habíamos estado hablando, el tercer día de estar el niño, le dije: Margarita lleva muchas noches aquí, te vas a agotar porque esto es largo, puedes estar aquí dos o tres semanas, yo te recomiendo que te vayas a tu casa, turneense, si tu quieres traete una enfermera por las noches porque no sabemos cuando vamos a terminar y a mi solicitud se habló con una enfermera especial que hablaron ellos; cuando ocurrió esta segunda ocasión le solicité que debido a la situación que había ocurrido yo quería que tuviera vigilancia, que tuviera una enfermera al lado de Eric todo el tiempo necesario, de ahí en adelante yo me fui a casa y ellos quedaron encargados de localizar esta enfermera.

LCDO. AGRAIT:

P. ¿Se localizó o nunca se localizó?

R. Nunca se localizó esta enfermera. Al día siguiente volvimos a hablar de las posibilidades, de cuanto tiempo, de cuan aguda es la crisis y su trabajo no sabía si lo iba a seguir o si iba a tener que renunciar; que la situación iba a ser un poco apretada; en vista de eso yo le dije a Margarita que en lo que esto se solucionaba y en lo que aparecía la enfermera que yo quería que ella me ayudara a hacer esta labor y le dí instrucciones." T.E., vol. V, págs. 96–99.

■ Este testimonio fue en parte corroborado por el propio señor López, padre del niño. Véase T.E., vol. I, pág. 235. Notamos, además, que desde el 28 de diciembre el Dr. Nieves había ordenado que se obtuviera el servicio de una enfermera especial para el turno de la noche. (³) Según dispone el Reglamento de Hospitales la enfermera especial es aquella contratada por el paciente y pagada por él o por una agencia a quien concierna su bienestar. 24 R.&R.P.R. sec. 18–172(5).

_____

(³) En la pág. 36 del récord médico correspondiente al 28 de diciembre aparece la siguiente orden del Dr. Nieves: "Get special nurse for night shift."

■ El tribunal determinó, sin embargo, en sus conclusiones de derecho, que por disposición expresa de la Ley Hill-Burton el Hospital Presbiteriano venía obligado a proveer gratuitamente los servicios de una enfermera especial. 42 U.S.C. sec. 291 *et seq.* Tal conclusión es errónea. En primer lugar porque no hay disposición alguna de la Ley Hill-Burton que imponga a las instituciones sin fines de lucro el ofrecer servicios gratuitos de enfermeras especiales. Dicha ley sólo dispone que las instituciones que hayan recibido financiamiento para la expansión y mejoras de sus facilidades hospitalarias deben proveer un volumen razonable de servicios gratuitos a las personas que no puedan pagar. Al efecto se faculta al Cirujano Mayor de los Estados Unidos a prescribir por reglamento, entre otras cosas, que:

". . . (2) se proveerá en las facilidades o porciones de las mismas a ser construidas o modernizadas un volumen razonable de servicios a la persona que no pueda pagar, pero se hará una excepción si tal requisito no es factible desde el punto de vista financiero." 42 U.S.C. sec. 291c(e)(2).

Como puede verse, se trata de una disposición de carácter general que no requiere la prestación de un servicio específico, y que, además, supedita la prestación gratuita del servicio a las condiciones financieras de la institución.

En segundo lugar, la conclusión del tribunal es errónea porque no se adujo prueba alguna para demostrar que para diciembre de 1965 el Hospital Presbiteriano hubiese recibido financiamiento bajo dicha ley y, en consecuencia, estuviese cubierto por sus disposiciones.([4])

Por otro lado, no es práctica de los hospitales brindar servicio gratuito de enfermera especial. Así lo expresó el Dr. Nieves en su testimonio, T.E., vol. V, pág. 101, el cual fue en parte corroborado por el Dr. Oliver, perito de los esposos López Luna, al testificar que no conocía ningún hospital en

---

([4])El recurrente levantó en su alegato que no fue hasta 1975 que logró cualificar y obtener un préstamo para mejoras bajo la Ley Hill-Burton.

Puerto Rico o en Estados Unidos que ofreciera tal servicio gratuitamente. *Id.* vol. I, pág. 154.

La obligación del hospital es brindarle al paciente la atención y el cuidado razonable que las circunstancias de su caso requiera. En *Hernández* v. *La Capital*, 81 D.P.R. 1031 (1960), expresamos que dependiendo de las circunstancias específicas del caso, las medidas precautorias adicionales podrían llegar hasta la vigilancia continua, ininterrumpida del paciente como en los casos de enfermos con diversas manifestaciones de desórdenes o deficiencias mentales, delirantes, epilépticos o aquellos que se encuentren en un estado de inconciencia total o parcial causado por el uso de drogas o anestésicos y que, asimismo, las normas de mayor exigencia rigen la conducta del hospital cuando se trata de niños enfermos. Esto no tiene el alcance de imponer la obligación de asignar una enfermera permanente a la habitación del enfermo ya que el costo de tal medida sería muy gravoso para el hospital. Nótese que en *Hernández* condicionamos la obligación del hospital a la adopción de una medida sencilla y de costo mínimo como lo era en la circunstancia de dicho caso la asignación de una enfermera adicional provisionalmente en lo que la auxiliar estaba fuera del pabellón en donde ocurrió el accidente.

En cuanto a la conclusión sobre la presencia de personas extrañas en la habitación del niño, surge del récord que fue la propia señora López quien así lo permitió:

"TESTIGO:

. . . . . . . .

P. ¿Oiga, y usted permitía que personas extrañas entraran a su cuarto estando usted allí?

R. Bueno, la gente lo quería ir a ver, ¿quién se va a negar?

P. ¿La gente lo quería ver y usted los dejaba entrar y salir?

R. Bueno, yo le dije al Lcdo. que como era un caso de tétano, estaba tan malo, lo iban a ver hasta ministros y a rezarle y todo.

P. ¿Pero eran personas allegadas a usted?

R. No.

. . . . . . . .

P. ¿Dio usted alguna queja porque entraran personas extrañas en el cuarto de su hijo?

R. No.

Lcdo. Agrait:

P. ¿Eso no le molestaba?

R. No." T.E., vol. I, págs. 150–152.

En resumen, también incurrió en error el tribunal de instancia al imponer responsabilidad al Hospital Presbiteriano por no haber suministrado gratuitamente el servicio de una enfermera especial, y, al considerar como actos negligentes del Hospital la presencia de personas extrañas en la habitación cuando fue la propia madre del niño quien lo permitió.

3. Otro factor que el tribunal de instancia tomó en consideración para imponer responsabilidad al Hospital Presbiteriano fue que no tenía el personal debidamente adiestrado y disponible para la atención de Eric las veinticuatro horas del día. Concluyó el tribunal que en muchas ocasiones había estudiantes de enfermería dando asistencia sin estar cualificados para ello; que no había atención especial para el caso particular de Eric; que no se le suministró una atención esmerada conforme las exigencias de su condición; que el personal debió alertar al Hospital a tomar medidas adecuadas para evitar el episodio ocurrido el primero de enero de 1966; que no se notificó inmediatamente la condición de Eric al Dr. Nieves, lo cual pudo ser causa próxima del daño cerebral; que del récord médico surge una serie de discrepancias entre las órdenes de los médicos para la administración de ciertos medicamentos y las notas de las enfermeras en cuanto al horario de la administración de las mismas, lo cual constituye negligencia.

Es preciso acudir nuevamente al récord para determinar si la atención y cuidado que las enfermeras brindaron a Eric fue razonable de acuerdo con las circunstancias específicas del caso.

Durante el curso de la enfermedad de Eric el personal del Departamento de Pediatría consistió de dos enfermeras graduadas, dos enfermeras prácticas y varias enfermeras estudiantes en el turno diurno para atender alrededor de 20 pacientes diarios. El Reglamento de Hospitales recomienda para asegurar una atención adecuada que el número de pacientes por enfermeras de cabecera no exceda de 40. 24 R.&R.P.R. sec. 18–177.[5] *Cf. Lugo Pérez* v. *Santo Asilo de Damas*, 89 D.P.R. 247 (1963). No hay duda pues de que el personal disponible era adecuado.

La señora López admitió que las enfermeras le cambiaban la sábana al niño cada vez que este se orinaba, lo que sucedía cuatro o cinco veces al día. T.E., vol. I, pág. 57; que las enfermeras venían a la habitación cada vez que ella les avisaba o cuando tenían que ponerle una inyección al niño, *Id.* pág. 67; que una estudiante de enfermería lo bañaba, lo vigilaba y le ponía el termómetro, *Id.* pág. 76; que venían a chequearlo a menudo, cada 20 ó 25 minutos, *Id.* págs. 76, 92. El señor López también admitió que nunca se quejó de la atención que las enfermeras brindaban a su hijo. *Id.* pág. 269.

Sobre las cualificaciones de las estudiantes de enfermería declaró la señora Rufina Aguirre de Torres que estas eran asignadas al Departamento de Pediatría al tercer año de estudios que era el último para graduarse. T.E., vol. I, pág. 215. Tenían la experiencia necesaria por haber pasado por

---

[5] Dicho reglamento provee:

"(a) A los fines de asegurar la atención adecuada de los enfermos, recomiéndase que:

(1) El número de pacientes por supervisora diurna no exceda de 75.

(2) El número de pacientes por supervisora nocturna no exceda de 80.

(3) El número de pacientes por enfermera de cabecera no exceda de 40.

"(b) Se recomienda que, para calcular el número de enfermeras necesarias en cada unidad de servicio, la administración del hospital utilice las cifras o normas sugeridas por la Liga Nacional de Educación de Enfermeras en el manual 'Essentials of Good Hospital Nursing Service.'"

otros departamentos y por haber llegado a la última parte del currículo. *Id.*

Nada hay en la prueba que conecte los daños sufridos por Eric con el hecho de que estas estudiantes lo bañaran, lo vigilaran y le pusieran el termómetro.

Hemos examinado detenidamente el récord médico y notamos la minuciosidad de las observaciones anotadas por las enfermeras. El propio tribunal de instancia hace referencia a las múltiples anotaciones sobre el desarrollo de la enfermedad y la condición crítica de Eric. No obstante, el tribunal señaló como parte de la conclusión sobre atención inadecuada, las discrepancias que surgen del récord entre las órdenes del médico y la administración de ciertos medicamentos. Se refiere el tribunal específicamente a que el Dr. Nieves ordenó que se le aplicara a Eric una primera dosis de 200,000 unidades de penicilina cada 12 horas y una segunda dosis de 100,000 cada seis horas. Sin embargo, las anotaciones de las enfermeras indican que no se siguió el horario especificado por el médico. Igualmente aparece una discrepancia similar con respecto al horario sobre la aplicación de luminal.

La contención del Hospital Presbiteriano es que estas discrepancias en realidad no ocurrieron, que al niño se le administraron los medicamentos puntualmente porque así lo declaró el Dr. Nieves y porque la madre no se hubiese cruzado de brazos; que no empece el esfuerzo de los supervisores y de los médicos para que las enfermeras mantengan los récords con exactitud estas discrepancias son inevitables ya que la mayor parte de las veces las enfermeras llenan el récord al terminar el turno de trabajo y ponen las horas conforme su mejor recuerdo, y, que en otras ocasiones se les pasa anotar debidamente la administración de determinados medicamentos a un paciente.

■ Reprobamos con preocupación esta laxitud en el mantenimiento del récord médico, que mengua su efectividad como instrumento útil para informar con exactitud el cum-

plimiento de las órdenes del médico y como fuente de referencia para la evaluación del tratamiento y de la atención y cuidado administrado al paciente. No se adujo, sin embargo, prueba que demostrara la relación de estas discrepancias con los daños sufridos por Eric. Conviene señalar que aparte de estas discrepancias, el récord médico cubre detalladamente el diagnóstico, que desde un principio fue correcto, las condiciones de Eric, el tratamiento ordenado por el Dr. Nieves, los exámenes de laboratorio efectuados, el desarrollo de la enfermedad, con sus cambios y complicaciones, que es el propósito fundamental de un récord médico. *Reyes* v. *Phoenix Assurance Co.*, 100 D.P.R. 871 (1973).

## II

■ Hemos visto que la prueba es insuficiente para sostener las conclusiones del tribunal sobre negligencia en la observación de las normas de la buena práctica de la medicina. Finalmente consideraremos otro aspecto de gran importancia como lo es la relación de causalidad entre la hipoxia sufrida por Eric el primero de enero de 1966 y los daños reclamados. La cuestión está íntimamente ligada a la discusión del primer error relacionado con el uso del procedimiento de traqueotomía o de la entubación endotraqueal. Consideramos conveniente discutirlo separadamente para mayor claridad de la exposición, pero sin perder de vista lo ya discutido y resuelto.

Debemos pues decidir ahora si los daños fueron consecuencia del tétano, o, como concluyó el tribunal de instancia, consecuencia de la falta de oxígeno sufrida por Eric el primero de enero de 1966, causada a su vez, por el tratamiento inadecuado de las enfermeras y el resto del personal del Hospital Presbiteriano ese día. El tribunal fundó su conclusión en que desde el 25 de diciembre Eric tenía períodos de convulsiones o dificultades respiratorias, cianosis y marcados espasmos por lo que el personal debió alertar al hospital a tomar otras me-

didas adicionales para evitar el episodio del primero de enero y en el cual no se le dio tratamiento hasta una hora y media después.

Es preciso examinar la prueba pericial, las autoridades médicas pertinentes y los hechos específicos del caso.

█ El tétano se define como una enfermedad producida por el bacilo *clostridium tetani* que se encuentra generalmente en las heces fecales de seres humanos y animales aunque también las esporas se encuentran en el aire sin que aparezcan signos vitales de suciedad. Cantor: 9 *Traumatic Medicine & Surgery for the Attorney*, 313; Gray: 2 *Attorneys' Textbook of Medicine*, sec. 40.18 (3rd ed.); *Diccionario Terminológico de Ciencias Médicas* (Salvat Editores, S.A., 8va. ed.); Schmidt: 2 *Attorneys' Dictionary of Medicine*, T. 31.

La incubación de la enfermedad puede producirse en términos de horas pero el período usual fluctúa entre cuatro y quince días. La gravedad del pronóstico depende de la rapidez del florecimiento de los síntomas; mientras más pronto aparecen los síntomas menos son las probabilidades de recuperación. Gray, *op. cit.*, sec. 40.18(2). Hay una estrecha correlación entre la incidencia de muerte y el intervalo que transcurre entre el primer síntoma, generalmente rigidez en el cuello o en la boca, y, la primera convulsión. Cantor ofrece la siguiente correlación:

| "Intervalos Transcurridos | Mortalidad (Por ciento) |
|---|---|
| 24 horas | 90 |
| 24–48 horas | 50 |
| 48–96 | 25 |
| 5 días o más | 10" |

Cantor, *op. cit.*, 320.

El estudio del Departamento de Pediatría de la Universidad de Tulane que mencionamos anteriormente revela que la recuperación tiene que ver más con el período de incubación

que con el tipo de tratamiento que se le administre al recién nacido. Este estudio confirma que "La prognosis es relativamente buena si la incubación ocurre después del séptimo día de vida, pero es extremadamente pobre si los síntomas aparecen más temprano." *The Journal of Pediatrics*, supra, a la pág. 351.

La tasa de mortalidad en casos de niños recién nacidos, como el de autos, es de más de un 70% y, aun con el tratamiento más cuidadoso, la mortalidad es extremadamente alta. Por eso, la Asociación Médica de los Estados Unidos ha propuesto como medida profiláctica un programa de inmunización general ya que considera que el tratamiento más efectivo es la prevención. Ficarra: *Surgical & Allied Malpractice*, 448 (Charles C. Thomas, Editor, 1968). Las estadísticas para el año 1965 revelan que hubo en los Estados Unidos 507 casos de tétano de los cuales murieron 363, el 68%. Los casos de tétano neunatorium fueron 54 con una incidencia de muerte de un 73%. Véase testimonio del Dr. Nieves. T.E., vol. VI, págs. 198–199.

La enfermedad se caracteriza por continuos espasmos, convulsiones, rigidez en el cuerpo y en el cuello, dificultad en tragar, intranquilidad e irritabilidad. Gray, *op. cit.*, sec. 40.18(1). Los espasmos de los músculos respiratorios afectan la respiración y pueden causar asfixia, anoxia, cianosis, por lo que deben mantenerse abiertas las vías respiratorias. También hay el riesgo de pulmonía por aspiración como consecuencia de la aspiración de partículas gástricas. El Dr. Oliver, perito de los esposos López Luna, describió los síntomas clásicos del tétano en la siguiente forma:

"Testigo:

R. Tétano empieza, específicamente a lo que estamos hablando de estos niños recién nacidos con una fase tipo catarral, después de las secreciones puede aparecer un estado de irritabilidad y de intranquilidad hasta que se va haciendo peor el estado de irritabilidad y dificultad respiratoria y rigidez genera-

lizada; al principio esta rigidez puede ser en el tronco y cuello, las manos; muy común los espasmos musculares. Aparte de ese cuadro puede aparecer también la rigidez de los terminales, las clásicas risas sardónicas, que es la contracción de los músculos de la boca dando el rictus clásico este, pasando entonces a trastornos respiratorios que entonces es cuando está el cuadro perfectamente florido. Eso en resumen es el . . . ." T.E., vol. II, págs. 151–152.

El récord demuestra que desde el 18 de diciembre Eric se sentía intranquilo e irritable y que ya para el 22 de diciembre manifestaba síntomas del tétano, se ponía trinco y no le cedía la boquita al tratar la madre de meterle el gotero; que el día 24 ya Eric estaba asfixiado y respirando con dificultad, T.E., vol. I, pág. 42; y presentaba rigidez en el cuello, *Id.* págs. 43, 173–174; viéndose obligada la madre a llamar por teléfono al Dr. Nieves porque notó que el niño estaba muy malo, *Id.* a la pág. 40. En la casa del Dr. Nieves el niño sufrió un espasmo y se puso negro. Durante los primeros días en el hospital el niño sufrió continuos espasmos y convulsiones, en una ocasión, el 27 de diciembre, sufrió una de 45 minutos y se veía cianótico y con coloración morada de la piel, según surge de las propias conclusiones del tribunal.

El Dr. Nieves testificó que una vez las toxinas tetánicas llegan al cerebro pueden causar la muerte aun sin haber complicaciones respiratorias o una retardación mental, siendo este daño irreversible; T.E., vol. V, págs. 56, 87; que los espasmos, convulsiones y cianosis son consecuencia de la lesión cerebral y que ocurren de momento sin previo aviso, vol. VI, págs. 97, 125; vol. VII, pág. 12; que tampoco se puede determinar cuándo va a surgir un período de anoxia, T.E., vol. VII, pág. 22; que no existe prueba de laboratorio o de cualquier otra clase que pueda determinar el daño cerebral sufrido por Eric en un período determinado de su enfermedad. T.E., vol. VII, pág. 38; que la dilación habida de doce horas en aplicarle tratamiento a Eric pudo causar un daño grave porque la gama de síntomas que le describió la madre por

teléfono el día 24 de diciembre—episodios de trismus, de dificultades de tragar, de ponerse morado, de irritabilidad—demostraban que las toxinas habían llegado al cerebro.

El Dr. Oliver admitió que no se podía decir qué grado de lesión cerebral había sufrido Eric antes de llegar al hospital. T.E., vol. II, pág. 186; que tampoco se podría saber que daño cerebral pudo haber sufrido Eric por haber estado sin tratamiento desde las nueve de la noche del 24 de diciembre hasta las 8 de la mañana del próximo día, cuando los padres lo llevaron a la casa del Dr. Nieves. T.E., vol. II, pág. 192.

■ El esquema de responsabilidad civil estatuido en el Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, requiere como condición previa al resarcimiento que la relación causal entre el daño que se reclama y el acto negligente que se imputa debe demostrarse con certeza razonable y no a base de conjeturas o especulaciones. *Rivera* v. *E.L.A.*, 99 D.P.R. 890 (1971).

El análisis que hemos hecho de la prueba pericial desfilada, de las circunstancias específicas del caso y la naturaleza de la enfermedad del tétano nos lleva a concluir que no hay base razonable en la prueba para demostrar que los daños sufridos por Eric fueron causados con mayor probabilidad por los actos y omisiones imputados a las enfermeras y al personal del Hospital Presbiteriano.

En realidad, la falla fundamental de este caso consiste en que, en las circunstancias apuntadas, la relación causal no es susceptible de ser comprobada a base de probabilidades razonables. Los efectos de una enfermedad de tan alta incidencia de muerte como el tétano, con una amplia gama de complicaciones secundarias, en que la recuperación del paciente depende más del período de incubación el cual no está sujeto a control por el conocimiento del hombre que del tratamiento que se le administre; en que se trata de un niño recién nacido que antes de llegar al hospital había ya sufrido episodios de trismus, espasmos, rigidez en el cuello y en la boca,

cianosis, y, que a juicio del Dr. Nieves, respaldado por prestigiosas autoridades médicas, el procedimiento de traqueotomía es de cautelosa aplicación, y aun la entubación endotraqueal presentaba serios riesgos, nos convence que cualquier conclusión sobre la causa de los daños—si el tétano, el tratamiento médico o la atención y cuidado de las enfermeras—es pura especulación.

### III

La opinión disidente especula que el tétano fue contraído por Eric en el Hospital Presbiteriano, cuestión sobre la cual no hemos expresado juicio alguno porque no ha sido levantada por las partes. El tribunal de instancia no halló que el tétano fuera contraído por Eric en el hospital. A pesar de ello, los esposos López-Luna no solicitaron al Tribunal enmiendas a las determinaciones de hechos ni hicieron señalamiento de error al efecto en su recurso de revisión. No fue por olvido o por incompetencia de su abogado que no lo hicieron, sino porque no tenían base en la prueba. Ambos peritos estuvieron de acuerdo en que no se podía decir dónde Eric contrajo el tétano. El perito de los esposos López-Luna, Dr. Oliver, atestó que inclusive el bacilo del tétano puede aparecer en la vagina de una mujer embarazada. El récord médico revela que se hicieron cultivos en el área del ombligo, de la circuncisión, de las secreciones, de la faringe y escreta para localizar el bacilo y los mismos fueron negativos. Tomo V, págs. 35, 36.

Es por eso que en la oposición de los esposos López-Luna a la expedición del auto en el recurso del Hospital Presbiteriano se acepta que la controversia real del caso gira en torno a la atención y cuidado prestado a Eric en el hospital.

▮ No es un mero tecnicismo lo que nos impide considerar la cuestión sobre el origen del tétano. Sabido es que con el más alto fin de impartir justicia hemos validado nuestra función revisora descartando tecnicismos y considerando cues-

tiones no levantadas por las partes cuando la prueba desfilada así lo justifica. *Piovanetti* v. *Vivaldi*, 80 D.P.R. 108 (1957) y *Santiago Cruz* v. *Hernández Andino*, 91 D.P.R. 709 (1965). Y ésa es, precisamente, la dificultad que confronta este caso: la ausencia de elementos fácticos y de prueba pericial indispensable para considerar la cuestión. El tribunal de instancia no pudo considerarla porque los esposos López-Luna no lo pusieron en condiciones de hacerlo. Tampoco podemos hacerlo nosotros. Tal falla no puede superarse con meras conjeturas, aunque comprendemos los sentimientos que las inspiran.

■ Este ha sido un caso penoso en que un sentimiento natural de solidaridad con Eric y sus padres ha hecho más ardua nuestra función de impartir justicia y de mantener el fino balance que debe guiar la aplicación del estándar de prueba en la relación causal: ni excesiva rigidez que impida probar una reclamación válida por la imprudencia profesional del médico o la deficiente atención hospitalaria, ni la laxitud que abre las puertas a la especulación y a la conjetura.

*Se dictará sentencia revocando la aquí recurrida.*

El Juez Asociado Señor Rigau se inhibió. El Juez Asociado Señor Irizarry Yunqué disintió en opinión separada.

—O—

Opinión disidente del Juez Asociado Señor Irizarry Yunqué.

San Juan, Puerto Rico, a 10 de mayo de 1978

Estoy de acuerdo con la opinión del Tribunal en cuanto concluye que el tratamiento prescrito por el Dr. Nieves ni fue inadecuado ni permite inferencia alguna de negligencia. Tampoco hay base para responsabilizar al Hospital Presbiteriano por la atención prestada a Eric desde su ingreso a dicho hospital y hasta el 1 de enero de 1966. Difiero, sin embargo, de que no incurriera en negligencia el Hospital el 1

de enero, cuando se produjo un fallo cardio respiratorio en el bebé, que a su vez causó una falta de oxígeno, o *anoxia*, condición que se mantuvo durante hora y media, sin que durante ese espacio de tiempo crítico se diera a la criatura tratamiento alguno. Además, considero que en el campo de las mayores probabilidades, es razonable inferir que el tétano fue contraído por el niño en el Hospital y no en Comerío.

Decía Eduardo Bonnier, *Tratado de las Pruebas*, tomo 1, pág. 9, que "[si] la ciencia del Derecho se dirige a establecer la conciencia humana, por su objeto, que no es otro que la consagración de las reglas de la justicia en cuanto interesa a la sociedad su sostenimiento, esta ciencia responde igualmente a una necesidad de la humanidad, cuando se pone por objeto, en la esfera que le está señalada, el descubrimiento de la verdad, tan necesaria a la inteligencia del hombre como es la justicia a su conciencia. Descubrimos la verdad cuando hay conformidad entre nuestras ideas y los hechos del orden físico o del orden moral que deseamos conocer. *Probar* es establecer la existencia de esta conformidad." De aquí se deduce que probar no significa establecer con exactitud la certeza de un hecho. Así lo reconoce la Ley de Evidencia cuando dice:

"La ley no exige aquel grado de prueba que, excluyendo la posibilidad de error, produzca absoluta certeza; porque tal prueba es rara vez posible. Sólo se exige la certeza moral, o un grado de prueba que produzca convicción en un ánimo no prevenido." 32 L.P.R.A. sec. 1624.

Es regla absoluta de exclusión en materia de prueba que jamás puede darse por probado lo imposible. Pero lo imposible no es lo improbable. Aceptar la comprobación jurídica de un hecho a base de posibilidades es especular. El convencimiento moral sobre la verdad desde el punto de vista de las pruebas es el convencimiento a que llega el juez sobre cuáles son las mayores probabilidades—qué es lo que con mayor probabilidad ocurrió—basado ese convencimiento en su razonamiento lógico, en sus propios conocimientos y experiencias

sobre los aconteceres humanos, sin que en ello intervengan elementos de prejuicio o de pasión. La función de aquilatar las pruebas compete por tanto al juzgador de los hechos; al juez de instancia. No nos compete a nosotros, que sólo tenemos ante nos récords mudos e inexpresivos. Por eso, cuando decidamos sustituir nuestro propio criterio por el del juez de instancia respecto a cuál es la verdad, debemos hacerlo solamente cuando sea claro y patente que el juez de instancia se equivocó, o que abusó de su discreción jurídica. En el caso ante nos, no encuentro base para alterar las determinaciones que sobre los hechos hizo el distinguido magistrado que dictó la sentencia recurrida.

Hemos reconocido que esta sabia norma de abstención tiene excepciones, entre ellas cuando se trata de prueba pericial y de prueba documental. No obstante, la excepción en cuanto a prueba pericial no puede ser absoluta pues los peritos son seres humanos sujetos a todas las flaquezas de la condición humana. Es frecuente que los peritos se contradigan unos a otros y que un perito se contradiga a sí mismo. Además, las opiniones de los peritos de nada sirven si no están enmarcadas en los hechos probados, sea por prueba directa, sea por inferencias y presunciones. El propósito de la prueba pericial es ilustrar sobre materia que pertenece a un campo especializado para que el juez, a base de un conocimiento adicional, pueda juzgar y determinar cuál es la verdad. Frente a prueba pericial controvertida tiene por necesidad que prevalecer como cierto aquello que con mayores probabilidades debió ocurrir.

La opinión de este Tribunal plantea si el daño al cerebro de Eric se produjo como consecuencia de los espasmos que sufrió antes del 1 de enero, o como consecuencia del fallo cardio respiratorio y la *anoxia* que se prolongó durante hora y media el 1 de enero, tiempo durante el cual el cerebro de Eric no recibió oxígeno. Decir que el daño al cerebro fue causado antes del 1 de enero es basar esa conclusión en una posibili-

dad. Eso es conjeturar. Un espasmo es una contracción muscular más o menos prolongada que se produce involuntariamente. *Diccionario Terminológico de Ciencias Médicas*, Salvat, 8va. ed.; Stedman, *Medical Dictionary*, ed. 1976; Schmidt, *Attorneys' Dictionary of Medicine*, vol. 2, pág. 5-79. Un espasmo no necesariamente paraliza la respiración ni la circulación de la sangre. Como más adelante señalo, hasta el episodio del 1 de enero Eric no tuvo obstrucción respiratoria. Un fallo cardio respiratorio implica por el contrario, paralización de la respiración, que es la vía de acceso del oxígeno a los pulmones, e interrupción del bombeo de sangre a través del sistema circulatorio. No puede haber duda que si falta oxígeno al cerebro éste se afecta.

Un hospital no es, ni puede ser, un mero proveedor de una cama en un cuarto para que allí repose un paciente. Aparte de proveer esa facilidad, el hospital debe estar preparado para prestar en cualquier momento la asistencia técnica médica y paramédica necesaria para salvar la vida de un paciente. Y aquí, Eric reposó en su cama del hospital, afectados sus esenciales signos vitales de corazón y pulmones durante hora y media sin que ese personal médico y paramédico algo hiciera, excepto avisar al médico de cabecera del niño y esperar hora y media a que dicho médico llegase.

Dado el carácter de gravedad del menor, su enfermedad y el cuadro crítico que presentaba de dificultad respiratoria, fue irrazonable que no se le diera atención médica de emergencia durante hora y media. No se le dio oxígeno, no se llamó a un médico residente del Hospital. Ni tan siquiera le dieron respiración artificial, para lo cual estaban entrenadas todas las enfermeras—graduadas y prácticas—según lo declaró la Sra. Rufina Aguirre de Torres, Directora del Departamento de Enfermeras del Hospital Presbiteriano. ¿Qué hubiese hecho cualquier enfermera, que por sus conocimientos debía advertir que a Eric se le escapaba la vida, si Eric hubiese sido su hijo? ¿Se hubiese cruzado de brazos, en actitud con-

templativa, en espera de un médico que tardó hora y media en venir? A mi juicio la actitud pasiva e indolente no puede calificarse de otra forma que de negligencia crasa e imperdonable.

No hay prueba en el récord que demuestre que antes del primero de enero de 1966 Eric sufriera una obstrucción respiratoria que requiriera como parte de una buena práctica médica el administrarle un tubo endotraqueal o una traqueotomía. El récord médico indica que Eric presentaba episodios de espasmos, convulsiones, cianosis e intranquilidad, *pero no de una obstrucción respiratoria*. Así lo reconoce la opinión de este Tribunal cuando dice:

"El récord médico indica que Eric presentaba episodios de espasmos, convulsiones, dificultades respiratorias, cianosis e intranquilidad, pero no de una obstrucción respiratoria que requiriera como parte de una buena práctica médica el administrarle un tubo endotraqueal o una traqueotomía."

Quiere esto decir que la única prueba en el récord del Hospital, de obstrucción a la respiración es la relativa al fallo cardio respiratorio que privó de oxígeno el cerebro de Eric el 1 de enero. Si hasta el 1 de enero no hubo obstrucción a la respiración ni fallo cardíaco, ¿puede dudarse de que fuera el episodio del 1 de enero el causante de la *anoxia* que determinó la condición mental que ahora padece Eric?

Examinemos la causa del tétano. El tétano no es una enfermedad nueva. Se conocía en los tiempos de Hipócrates. Los antiguos la reconocían como azote particular de mujeres parturientas, bebés recién nacidos y soldados heridos. Cantor, *Traumatic Medicine & Surgery for the Attorney*, vol. 9, pág. 312. La produce un germen anaeróbico, es decir, que se desarrolla en ausencia de oxígeno, al tener acceso a la corriente sanguínea a través de una herida, en especial heridas profundas o allí donde se devitaliza el tejido y ocurre la necrosis. Señala Cantor, *op. cit.*, pág. 313:

"El sitio de la herida influye en el riesgo de que se desarrolle tétano; el área entre el ombligo y las rodillas conlleva el mayor riesgo; la oportunidad de que heridas en la cabeza se compliquen por el tétano son menores, pero cuando ello sucede la infección es frecuentemente letal."

Y en la sección titulada *Surgical Infections* del capítulo 30 de la obra *Lawyers' Medical Cyclopedia*, vol. 4, sec. 30.21, se señala:

"El organismo puede lograr entrar al cuerpo por vía de heridas, no importa cuán pequeñas, y en el caso de bebés recién nacidos vía el corte del cordón umbilical."

Entre las clasificaciones clínicas del tétano se halla el tétano *neonatorum*, designado como una infección del tocón (*stump*) umbilical de niños recién nacidos. Cantor, *op. cit.*, pág. 320. El período usual de incubación, (¹) es decir, desde que el germen tiene acceso al organismo humano hasta que sus exotoxinas afectan al sistema nervioso y se manifiestan los síntomas de la enfermedad, es de 6 a 15 días. Cantor, *op. cit.*, pág. 320, *Lawyers' Medical Cyclopedia*, sec. 30.21, pág. 208. Mientras más breve sea el período de incubación más virulenta o maligna es la enfermedad y más improbable la recuperación del paciente. Cantor, *op. cit.*, pág. 329; Gray, *Attorneys' Textbook of Medicine*, tomo 1, sec. 1.71.

Los síntomas y signos del tétano comienzan a manifestarse a base de irritabilidad y dolor de cabeza. En los niños recién nacidos aparece una fase tipo catarral, el niño tiene secreciones, y se torna irritable e intranquilo, tiene dificultad en tragar, y luego aparecen la rigidez, particularmente del cuello y la espalda, el *trismus*, o tranque de las mandíbulas, los espasmos musculares y las convulsiones y los fallos cardio respiratorios. Gray, *op. cit.*, sec. 40.18(1); Cantor, *op.*

_____

(¹) "Incubación" es definido por el Diccionario de la Real Academia Española de la Lengua así: "Desarrollo de una enfermedad desde que empieza a obrar la causa morbosa hasta que se manifiestan sus efectos."

*cit.*, pág. 319; testimonio del Dr. Oliver, T.E., vol. II, pág. 151 ss.

Como en toda enfermedad infecciosa, es de particular importancia para la prevención del tétano que se observen las más rigurosas medidas de asepsia tanto en el proceso de intervenir quirúrgicamente con una persona como en el tratamiento posterior. No creo que esto se discuta.

Teniendo presente estas consideraciones sobre el tétano, atendamos al caso particular de Eric. Este niño nació en el Hospital demandado el 15 de diciembre de 1965. Se le cortó el cordón umbilical y se le practicó una circuncisión. Se le mantuvo en el Hospital hasta el 18 de diciembre en que él y su madre fueron dados de alta. Ese mismo día fue llevado a casa de sus abuelos en Comerío y ese mismo día advirtió su madre los primeros síntomas de anormalidad, pues se mostraba intranquilo y lloraba, condición que fue empeorando hasta que el 22 de diciembre notó secreciones nasales y ya el 23 y el 24 tenía tranque en la boca, que no le cedía para permitir la introducción de un gotero. Ya estaba completo el cuadro que señalaba inequívocamente el diagnóstico de tétano.

La opinión de este Tribunal sugiere la *posibilidad* de que el germen del tétano tuviera acceso al sistema de Eric en Comerío porque por cerca de la casa en que estaba pasaba un río y porque a ese río se echaban desperdicios y basura. Convenimos en que esa es una posibilidad. Supone ello que el germen tuvo acceso al cuerpo de Eric por una de dos entradas: donde se cortó el cordón umbilical o en el área de corte de la circuncisión. Es de suponer, además, que uno u otro portal de entrada del germen estuvo al descubierto para que algún insecto llevase allí el germen, o lo llevase el viento, o que lo llevare alguna persona que manipulara al bebé. Todas son posibilidades.

Hay otras posibilidades que no menciona la opinión de este Tribunal. Hay prueba en el récord de la presencia de ratones y de cucarachas en el patio del Hospital, hacia el cual

daba una escalera cercana al *nursery*, por cuyas paredes discurría un sistema de tubería. ¿Puede descartarse la posibilidad de que en tales circunstancias no hubiera la asepsia adecuada en el hospital en el cual pasó los primeros días de su vida?

Sin duda es conjeturar escoger sin más una de esas posibilidades. Pero, como hemos señalado, y esta es la doctrina a que parece acogerse la opinión de este Tribunal, la verdad jurídica, en ausencia de prueba directa, ha de deducirse a base de las mayores probabilidades, teniendo en cuenta las circunstancias presentes. Veamos cuáles son estas circunstancias.

Se dice en la opinión del Tribunal que el período *usual* de incubación del germen del tétano fluctúa entre cuatro y quince días, tomando como mínimo el período de cuatro días no empece ser seis días el mínimo reconocido mayoritariamente. Se señala por otra parte, que *"puede producirse* en términos de horas." Las mayores probabilidades, base en que se apoya la verdad jurídicamente aceptable, no pueden a su vez basarse en lo excepcional. Lo excepcional aquí y posible es que el período de incubación fuera de horas. Lo usual y lo probable es que fuera entre seis y quince días. Aquí los síntomas comenzaron a manifestarse el 18 de diciembre, día en que se dio de alta del Hospital a Eric. ¿Es más probable que el germen tuviera acceso a su organismo ese mismo día, en Comerío y que horas después ya hubiese incubado y producido los síntomas? ¿O es más probable que el acceso se produjese en el Hospital y la incubación se tomase el período usual?

Más aún, si el bebé contrajo el tétano en Comerío y pocas horas después ya se había producido la incubación, estaríamos sin duda frente al más virulento caso de la enfermedad. Hemos señalado que mientras más breve sea el período de incubación más improbable es la recuperación. Así lo acepta la opinión de este Tribunal, que adopta el siguiente pronunciamiento del Departamento de Pediatría de la Universidad de

Tulane: "La prognosis es relativamente buena si la incubación ocurre después del séptimo día de vida, pero es extremadamente pobre si los síntomas aparecen más temprano." *The Journal of Pediatrics,* vol. 42, pág. 351. En nuestro caso, no empece que se trataba de un niño recién nacido, excepto por la complicación que surgió el 1 de enero y que se mantuvo intratada por hora y media causando el daño al cerebro que ha hecho de Eric un retardado mental, la enfermedad no fue fatal a pesar de la alta tasa de mortalidad por tétano en casos de infantes, que señala la opinión del Tribunal. La enfermedad en el caso de Eric no le ocasionó la muerte. No fue tan corto, por tanto, el período de incubación. Tuvo lógicamente que ocurrir la infección mientras Eric era paciente del Hospital Presbiteriano, y en tal caso ello no hubiere ocurrido si hubiese habido la asepsia necesaria y que es de esperarse que haya en un hospital.

No hemos pasado por alto que el tribunal a quo no concluyó que el tétano *neonatorum* fuera contraído por Eric en el Hospital Presbiteriano. Tampoco concluyó que fuera contraído en Comerío. Sugiere la opinión de este Tribunal que, no habiéndose planteado la cuestión por los demandantes, ya fuere vía solicitud de enmiendas a las determinaciones de hechos ante el tribunal a quo, o ya en revisión ante nos, [2] "[es] injustificada la especulación sobre el origen del tétano." Con todo respeto a ese criterio, debo señalar que los recursos de revisión se dan contra la sentencia y no contra sus fundamentos. El tribunal a quo halló incurso en responsabilidad al Hospital Presbiteriano y declaró con lugar la demanda. El Hospital pretende convencer a este Tribunal de que tal sentencia es errónea porque no incurrió en conducta negligente. ¿Pretende este Tribunal que si hallásemos que la única base de responsabilidad del Hospital fuese que por su descuido Eric contrajo el tétano, no tendría derecho a una sentencia a

[2] Los demandantes recurrieron también ante nos para impugnar como inadecuadas las cantidades concedidas como indemnización.

su favor porque no se ha planteado ante nos? Si fuese así, seríamos un Tribunal de tecnicismos; no un Tribunal de Justicia.

Señalamos en *Collado* v. *E.L.A.*, 98 D.P.R. 111, 114 (1969), que como el objeto de la revisión es la sentencia y no sus fundamentos, podía este Tribunal, y así lo hizo, determinar si bajo los hechos probados concurrió algún acto negligente generador de responsabilidad de la parte demandada. En *Coll* v. *Picó*, 82 D.P.R. 27 (1960), se negó este Tribunal a considerarse obligado por admisiones y estipulaciones de las partes en su misión de aplicar el Derecho, subrayando que ". . . en virtud de esa facultad el Tribunal está en libertad de aplicar la norma que estime pertinente y adecuada, aunque sea separándose de las alegaciones, admisiones o acuerdos de los litigantes." Con mucha más razón estamos en libertad de investigar, al revisar una sentencia, la totalidad de la prueba y formular aquellas determinaciones que esa prueba justifique, y que constituyan el balance más racional, justiciero y jurídico de la misma. *Sanabria* v. *Sucn. González*, 82 D.P.R. 885, 995 (1961). En *Piovanetti* v. *Vivaldi*, 80 D.P.R. 108, 121 (1957), seguido en *Dávila* v. *Valdejully*, 84 D.P.R. 101, 105 (1961) y en *Santiago Cruz* v. *Hernández Andino*, 91 D.P.R. 709, 711 (1965), expresamos "que la norma general de que en apelación este Tribunal no conocerá ni resolverá ninguna cuestión que no haya sido planteada o resuelta por el tribunal de cuya sentencia se apela no es un dogma inquebrantable sino que tiene numerosas excepciones y limitaciones." Ratificamos en *Santiago*, supra, pág. 712 "que debemos descartar la arcaica teoría de que un apelante nunca puede variar en apelación su teoría del caso." Refiriéndonos a lo resuelto en *Piovanetti*, dijimos: "Expresamos que dicha teoría sólo constituye un ritualismo incompatible con la exigencia de fallar los casos en sus méritos." Por esos mismos fundamentos tengo que rechazar que se pretenda que estamos impedidos en el caso ante nos de determinar dónde, cuándo y

por qué contrajo tétano Eric. Determinarlo con certeza es imposible. Determinarlo jurídicamente, es decir, conforme a las deducciones lógicas que el examen de la totalidad de la prueba exige, es a mi juicio obligación de este Tribunal para poder hacer cumplida justicia. La justicia jamás debe ser aprisionada por los tecnicismos.

Debería confirmarse la sentencia recurrida.