ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| **DOMINGO BENJAMÍN BENÍTEZ LIBERATO**<br><br>Apelante<br><br>v.<br><br>**Dr. RAFAEL A. TABOAS PÉREZ y OTROS**<br><br>Apelados | KLAN202400007 | **APELACION** procedente del Tribunal de Primera Instancia, Sala Superior de **San Juan**<br><br>Civil Núm.: **SJ2019CV05565**<br><br>Sobre: Daños y Perjuicios |

Panel integrado por su presidente, el Juez Sánchez Ramos, el Juez Pagán Ocasio, el Juez Marrero Guerrero y la Jueza Boria Vizcarrondo.

Boria Vizcarrondo, Jueza Ponente.

**SENTENCIA**

En San Juan, Puerto Rico, a 21 de octubre de 2024.

Comparecen ante nos, mediante *Apelación,* el señor Domingo Benjamín Benítez Liberato (Sr. Benítez) y su esposa, la señora Melitza Osorio Santiago (Sra. Osorio) (conjuntamente, Apelantes) y nos solicitan que revoquemos la *Sentencia* emitida el 26 de octubre de 2023 por el Tribunal de Primera Instancia, Sala Superior de San Juan (TPI).[1] Mediante la misma, el TPI declaró No Ha Lugar a la *Demanda*[2] incoada por los Apelantes en contra del doctor Rafael A. Taboas Pérez (Dr. Taboas), la Clínica Taboas, el Hospital Pavía de Santurce (Hospital Pavía), el doctor Nicolás M. Pérez Maldonado (Dr. Pérez), el doctor José F. Jiménez Rosado (Dr. Jiménez), sus cónyuges, las sociedades de gananciales compuestas por ellos y sus aseguradoras (en conjunto, Apelados).

---

[1] Apéndice de *Apelación*, Anejo XXXVII, págs. 602-648. Notificada y archivada en autos el 26 de octubre de 2023.
[2] *Íd.*, Anejo I, págs. 1-52.

Por las razones que discutiremos a continuación, confirmamos la *Sentencia*.

## I.

Según la prueba ventilada y creída por el TPI, el 2 de marzo de 2010, el Sr. Benítez acudió a las oficinas del Dr. Taboas, un neuro-oftalmólogo con experiencia manejando el síndrome PTC, en búsqueda de tratamiento médico por problemas de enfoque y visión disminuida en el ojo izquierdo.[3] En aquel momento, el Dr. Taboas le diagnosticó papiledema, una elevación del nervio óptico que se produce por el aumento en la presión intracraneal, y lo refirió para evaluaciones de seguimiento. Posteriormente, fue evaluado por el Dr. Pérez, neurólogo, quien le ordenó que se realizara el procedimiento de punción lumbar. Este procedimiento fue realizado el 31 de marzo de 2010 y resultó en el alivio de la presión intracraneal. A base de su evaluación, el Dr. Pérez le diagnosticó con *pseudo tumor cerebri* (PTC).[4] El PTC, también conocido como hipertensión intracraneal idiopática (IIH), es un síndrome de aumento en la presión intracraneal de la cual se desconoce su etiología y no se le puede adjudicar a una causa como una masa o tumor, una infección intracraneal como meningitis, o alguna otra explicación. Ambos doctores continuaron manejando su condición con una prescripción para el medicamento Diamox.

Desde aquel entonces, el Sr. Benítez quedó con daño a los nervios ópticos y pérdida de visión en el ojo izquierdo. Aunque su visión no se normalizó, con los tratamientos, su condición mejoró y quedó estabilizada, por lo que se le descontinuó el uso de Diamox en febrero de 2011.[5] En sus notas, el Dr. Pérez notó que aunque el papiledema estaba disminuyendo, había palidez en el disco, lo que

---

[3] *Íd.*, Anejo XXXVIII, pág. 609.
[4] *Íd.*, pág. 611.
[5] *Íd.*

sugería que el papiledema había tenido un efecto estructural sobre el nervio óptico.[6] Esto ocasionaría la pérdida de volumen que eventualmente produciría atrofia del nervio.[7] Dicho diagnóstico se realizó en el 2010. Posteriormente, dejó de acudir a las citas con el Dr. Pérez, quien señaló que no supo de él por cinco (5) años; continuó sus visitas con el Dr. Taboas y su condición se mantuvo bajo control. A partir del 2012, acudía anualmente a las citas de seguimiento con el Dr. Taboas. El Dr. Taboas testificó que le informó al Sr. Benítez que debía estar pendiente a cambios súbitos en su visión, y de tenerlos, debería acudir a su oficina de inmediato para evaluarlo.[8]

Tras percibir un deterioro en su calidad de agudeza visual y dolores de cabeza persistentes, el 2 de octubre de 2017, el Sr. Benítez acudió a la Sala de Emergencias del Hospital Pavía.[9] Al tiempo, lo acompañó su esposa, la Sra. Osorio. En la Sala de Emergencias, fue atendido por el Dr. Jiménez, médico generalista, a quien le informó que tenía dolor de cabeza y pérdida de agudeza visual, pero que no sufría de fiebre, náuseas, vómitos o fotofobia.[10] No obstante, surge de la prueba que en aquel momento, el Sr. Benítez no le informó de su historial médico.[11] Existe controversia sobre dicha conclusión. El Dr. Jiménez testificó que, cuando un paciente viene con dolor de cabeza, es importante saber si tiene alguna condición neurológica y que a base de las preguntas que le realizó como parte del *Triage*, el Sr. Benítez negó tener alguna.[12] Su evaluación mostró que el Sr. Benítez no tenía rigidez en la nuca, ni espasmos musculares, meningismo o problemas visuales. Además,

---

[6] *Íd.*, págs. 611-612.
[7] *Íd.*, pág. 612.
[8] *Íd.*
[9] *Íd.*, pág. 613.
[10] *Íd.*
[11] *Íd.*, págs. 613-614. (Tanto el Sr. Benítez como la Sra. Osorio testificaron que el Sr. Benítez le informó al Dr. Jiménez sobre su diagnosticó previo de PTC. No obstante, el récord médico refleja que nunca lo hizo).
[12] *Íd.*

dio un 15/15 (normal) en el Glasgow Coma Scale que mide las funciones neurológicas luego de una lesión cerebral.[13] En consecuencia, el Dr. Jiménez ordenó un CT Scan para descartar cualquier condición intracraneal, el cual salió negativo, por lo que no había sangrado, tumor ni aumento en la presión intracraneal. Ante este cuadro, el Dr. Jiménez le recetó el medicamento Tencon y le dio de alta con el diagnóstico de dolor de cabeza tensional. No obstante, el Sr. Benítez testificó que también recibió inyecciones y pastillas de Toradol, que no fueron recetados por el Dr. Jiménez, sino conseguidas por una amiga enfermera.[14] Tomó ambos medicamentos.

El 5 de octubre de 2017, tras dolores de cabeza que iban y venían, así como la falta de cambios en su agudeza visual, el Sr. Benítez intentó acudir a las oficinas del Dr. Taboas. No obstante, debido a las medidas implementadas tras el paso del Huracán María el 20 de septiembre de 2017, la seguridad del edificio no lo dejó subir.[15] Por lo tanto, acudió a las oficinas del doctor Iván Lladó (Dr. Lladó), cardiólogo, en el Hospital HIMA San Pablo, por tener la presión un poco alta y dolor de cabeza. Ese día, no tenía problemas de la visión.[16] El Dr. Lladó anotó su presión arterial en 140/100 y surge del récord médico que el Sr. Benítez le informó de su previo diagnóstico de papiledema. En consecuencia, el Dr. Lladó le ordenó realizarse varias evaluaciones cardiovasculares sin referirlo a una sala de emergencias para punciones lumbares o un MRI.[17]

Luego de salir de la oficina del Dr. Lladó, visitó las oficinas del Dr. Pérez para evaluar su nervio óptico.[18] Mientras esperaba a ser atendido, se comunicó telefónicamente con el Dr. Taboas y le

---

[13] *Íd.*
[14] *Íd.*, pág. 614.
[15] *Íd.*, pág. 615.
[16] *Íd.*
[17] *Íd.*
[18] *Íd.*

informó de sus síntomas y temor de perder su visión.[19] El Dr. Taboas, en turno, lo citó para una evaluación médica el 10 de octubre de 2017.[20] Le instruyó que fuera a ser evaluado por el Dr. Pérez, sin saber que ya se encontraba en sus oficinas, y luego que fuera a una sala de emergencias.[21]

Luego, fue atendido por el Dr. Pérez, a quien le informó de sus síntomas. El Dr. Pérez testificó que no había visto al Sr. Benítez en cinco (5) años.[22] Le realizó varias evaluaciones y documentó su historial médico de PTC y papiledema. Le realizó un examen de fondo de ojo en el que observó cierta opacidad en el lente, sin hemorragia, papiledema ni exudado en la retina. Hizo una prueba de desaturación de color que mostró desaturación en el ojo izquierdo, que indicó daño en el nervio óptico.[23] El Dr. Pérez no vio papiledema en aquel momento. Luego de su evaluación, el Dr. Pérez determinó que el Sr. Benítez sufría de un dolor de cabeza no específico, posiblemente asociado con la alta presión arterial *de novo*.[24] Surge de la prueba que el Sr. Benítez no le indicó al Dr. Lladó ni al Dr. Taboas, ni al Dr. Pérez sobre el deterioro de su agudeza visual o pérdida de visión porque no la tenía en aquel momento.[25] El Dr. Pérez testificó en el juicio que si hubiese encontrado unos cambios neurológicos que le indicaran que podía existir un diagnóstico diferencial que incluyera condiciones que le pudieran haber costado la vida al paciente, hubiese ordenado un MRI de inmediato.[26]

El Sr. Benítez testificó que entre el 5 de octubre y el 9 de octubre, veía bien y que su única queja fue un leve dolor de cabeza.[27] Sin embargo, el 10 de octubre de 2017, amaneció sin visión en el ojo

---

[19] *Íd.*
[20] *Íd.*
[21] *Íd.*, págs. 615-616.
[22] *Íd.*, pág. 616.
[23] *Íd.*, pág. 617
[24] *Íd.*, pág. 618.
[25] *Íd.*
[26] *Íd.*
[27] *Íd.*, pág. 619.

izquierdo.[28] Temprano esa mañana, acudió a las oficinas del Dr. Taboas, quien lo examinó. Mediante una serie de exámenes, encontró que en el ojo derecho tenía fluctuaciones normales de visión, mientras que en el ojo izquierdo tenía pérdida severa de visión.[29] En el fondo ocular, los nervios ópticos de ambos ojos se veían atrofiados, como lo estaban en el 2010, y no hubo hallazgo de papiledema.[30] Documentó un historial de dolor cervical nuevo, así como rápida pérdida de visión y fotofobia.[31] Al sospechar la posibilidad de una aneurisma cerebral, lo refirió con urgencia a que se evaluara con MRI.

Así las cosas, el Sr. Benítez, acompañado por la Sra. Osorio, acudieron a la Sala de Emergencias del Hospital Pavía, donde fueron atendidos nuevamente por el Dr. Jiménez. El Dr. Jiménez le realizó los estudios ordenados y determinó necesario admitirlo para realizarle una punción lumbar, el cual fue realizado el 11 de octubre de 2017. Habiéndose disminuido la presión intracraneal tras el tratamiento ordenado, el 13 de octubre de 2017, fue dado de alta.[32]

Subsiguientemente, el Sr. Benítez compareció a citas de seguimiento con el Dr. Taboas. El 16 de octubre de 2017, al percibir el deterioro en la visión de ambos ojos, el Dr. Taboas le aumentó la receta de Diamox y le ordenó a tomar unos esteroides (Medrol pack).[33] El 18 de octubre de 2017, volvió a las oficinas del Dr. Taboas sin mejoras en su visión. Este realizó un examen de fondo de ojo, en el que encontró que los nervios ópticos estaban pálidos y mínimamente elevados. Documentó PTC con pérdida severa de visión y nuevamente lo refirió a realizarse una punción lumbar en el Hospital Pavía.[34] Además, si la presión intracraneal seguía elevada,

---

[28] *Íd.*
[29] *Íd.*
[30] *Íd.*
[31] *Íd.*
[32] *Íd.*, pág. 620.
[33] *Íd.*
[34] *Íd.*

ordenó que consultaran con neurocirugía para la posible colocación de un *shunt*, un instrumento médico permanentemente colocado en el cerebro o espina para drenar líquido excesivo y redirigirlo a otra parte del cuerpo donde podrá ser reabsorbido.[35]

Ese mismo día, los Apelantes acudieron al Hospital Pavía y se admitió al Sr. Benítez. El próximo día, se le realizó la punción lumbar y consultan con el doctor Julio Rosado (Dr. Rosado).[36] Pese haberle realizado otra punción lumbar, el Dr. Rosado determinó que era necesario el *shunt*, puesto que la presión intracraneal seguía elevada. El Dr. Rosado realizó el procedimiento y la condición del Sr. Benítez mejoró. Así las cosas, el 28 de octubre de 2017, el Sr. Benítez fue dado de alta.[37]

El Sr. Benítez continuó acudiendo a las oficinas del Dr. Taboas para seguimiento hasta junio de 2018. Además, comenzó a atenderse con el doctor Luis Serrano (Dr. Serrano), neuro-oftalmólogo, en las Clínicas Externas de Centro Médico. Según la prueba presentada, el Sr. Benítez es legalmente ciego e incapacitado por Seguro Social. Según el testimonio del Sr. Benítez y de la Sra. Osorio, el Sr. Benítez ha logrado aprender a vivir con su ceguera y gozar de una vida plena, aunque ha enfrentado dificultades emocionales y físicas. Ha tenido que adaptarse a las nuevas condiciones que le ha presentado la vida. Testificó que con el apoyo de rehabilitación vocacional, su esposa la Sra. Osorio, su hermana María del Pilar Benítez Liberato, su psicóloga la doctora María del Amor Rodríguez y el sacerdote de su iglesia, padre Carlos Manuel, ha podido lograr un nivel de estabilidad emocional y financiera.[38] Ha aprendido a utilizar un bastón, leer en Braille y utilizar tecnología

---

[35] *Íd.*
[36] *Íd.*
[37] *Íd.*
[38] *Íd.*, pág. 621.

para personas no videntes para leer y escribir. Utiliza un servicio del AMA (Llame y Viaje) que lo lleva al y recoge del trabajo.[39]

Al entender que la conducta de los doctores Taboas, Jiménez y Pérez se apartaron de las mejores prácticas de la medicina moderna, el 31 de mayo de 2019, los Apelantes presentaron una *Demanda* por daños ante el TPI.[40] En síntesis, los Apelantes alegaron que el cuadro de síntomas que presentó el Sr. Benítez en octubre de 2017 fue suficiente para levantar sospecha de un problema relacionado al nervio óptico y presión intracraneal. Alegaron que los doctores demandados no realizaron los estudios, exámenes o pruebas necesarias para diagnosticar el papiledema del Sr. Benítez con tiempo. Concluyen que la demora en el diagnóstico de la condición del Sr. Benítez constituyó "el nexo causal cuyo desenlace fue la pérdida permanente e irreversible de la visión del demandante Benítez Liberato".[41]

Con la presentación de la *Demanda,* los Apelantes incluyeron el *Informe Médico Pericial* del doctor Edwin Miranda Aponte (Dr. Miranda), perito de la parte demandante/apelante.[42] El Dr. Miranda obtuvo el grado de *Medical Doctor* (MD) en el 1981 de la Universidad Literaria de Valencia. En el 1991, el Tribunal Examinador de Médicos le otorgó una especialidad en medicina de emergencia a través de un *Grandfather Clause.* No obstante, nunca ha sido *Board Certified* en Medicina de Emergencia, ni cursó estudios especializados en medicina de emergencia. Del 1994 al 2018, fue médico de la Sala de Emergencias de Centro Médico de Puerto Rico (ASEM) hasta su retiro. Desde el 2018, no ha practicado la medicina.

El 15 y 16 de junio de 2023, el Dr. Miranda testificó ante el TPI. Durante el *Voir Dire,* testificó que no tenía entrenamiento formal

---

[39] *Íd.*
[40] *Íd.*, Anejo I, págs. 1-52.
[41] *Íd.*, pág. 10.
[42] *Íd.*, págs. 12-32.

en Medicina Interna, Oftalmología, Neuro-Oftalmología, Neurología, Radiología, Neuro-Radiología, ni Anestesiología.[43] No obstante, por su experiencia y carrera, el TPI lo certificó como perito en Medicina General.[44] Testificó que basó su Informe Pericial en el expediente del Sr. Benítez que lo vio el Dr. Taboas, los resultados de las pruebas y exámenes realizados, los récords de la Sala de Emergencias del Hospital Pavía, los récords de admisión del Sr. Benítez al Hospital Pavía, los récords del consultorio de los doctores Pérez y Lladó, la literatura científica citada y la narrativa escrita del Sr. Benítez.[45]

Durante el contrainterrogatorio, el Dr. Miranda testificó que la PTC, una vez diagnosticada y tratada, podrá recurrir al paso del tiempo.[46] Admitió que del récord médico de la Sala de Emergencias del Hospital Pavía del 2 de octubre de 2017, no surge que el Sr. Benítez le haya notificado al personal del *Triage* sobre su historial con PTC, dolor en el cuello, visión borrosa ni dolor en los ojos; tampoco se las hizo al Dr. Jiménez.[47] En cuanto a las preguntas hechas para diagnosticar al Sr. Benítez, testificó que el 2 de octubre de 2017, el Dr. Jiménez realizó una evaluación completa del historial médico pasado e hizo una revisión de todos los sistemas del paciente.[48] Aceptó que existe un conflicto claro entre la narrativa del Sr. Benítez, en la que expresó que le notificó al personal médico del Hospital Pavía de su historial médico, y el récord médico oficial. Finalmente, admitió que su Informe Pericial estuvo basado tanto en el récord médico como en la narrativa del Sr. Benítez, pero que en este caso, le dio más credibilidad a la narrativa que al récord, contrario a la norma general.[49] La parte Apelada, por su parte, presentó al doctor Carlos Gómez Marcial (Dr. Gómez) como perito

---

[43] *Transcripción 15 de junio de 2023*, págs. 26-29.
[44] *Íd*., pág. 48.
[45] *Íd*., pág. 61.
[46] *Transcripción 16 de junio de 2023*, págs. 32-33.
[47] *Íd*., págs. 34-37, 40, 71.
[48] *Íd*., págs. 38, 50-51.
[49] *Íd*., págs. 121-122.

con especialidad en Sala de Emergencias. Basado en el récord médico de la Sala de Emergencias del Hospital Pavía del 2 de octubre de 2017, el Dr. Gómez testificó que la intervención del Dr. Jiménez fue apropiada y se apegaba a los estándares de la buena medicina.[50]

La cuestión medular del diagnóstico del Dr. Jiménez recaía sobre si el Sr. Benítez le informó al doctor sobre su historial médico. Tanto el Dr. Jiménez en su testimonio como el récord médico estipulado señalaron que dicha información no fue provista. El Sr. Benítez y la Sra. Osorio ambos testificaron que sí la informó. El TPI tuvo que dirimir este aspecto de credibilidad para llegar a sus conclusiones. Ante los testimonios en conflicto, al TPI le mereció credibilidad el hecho de que en la Sala de Emergencias del Hospital Pavía, al Sr. Benítez "lo atendieron por lo menos (3) personas y que no surge anotación alguna por parte de éstas de que éste refiriera como parte de su historial médico pasado haber padecido de *pseudotumor cerebri* ("*PTC*"), así como tampoco se hace mención alguna de que refiera cambios en su agudeza visual".[51] Por otro lado, le restó credibilidad al testimonio del Sr. Benítez, que no fue preciso al responder en su contrainterrogatorio al contestar preguntas sobre la evaluación que le realizó el Dr. Jiménez. Por lo tanto, el TPI concluyó que el récord médico no estaba incorrecto.

En cuanto al Dr. Taboas, el Dr. Miranda testificó que éste se apartó de las mejores prácticas de la medicina moderna al no referir al Sr. Benítez a una sala de emergencias el 5 de octubre de 2017, cuando lo llamó desde las oficinas del Dr. Pérez.[52] Dicha conducta, según el Dr. Miranda, permitió la evolución libre y natural desenfrenada de la PTC, lo que le costó la visión al Sr. Benítez.[53] No obstante, el Dr. Miranda testificó posteriormente que desconocía

---

[50] *Transcripción 21 de junio de 2023*, pág. 269.
[51] Apéndice, *supra*, Anejo XXXVIII, pág. 641.
[52] *Transcripción 15 de junio*, *supra*, págs. 175-177.
[53] *Íd*., pág. 198.

que el Sr. Benítez habló con el Dr. Taboas antes de ser evaluado por el Dr. Pérez, y que el Dr. Pérez también lo había tratado en el 2010 para papiledema y PTC. También reconoció que el Dr. Pérez, luego de evaluar al Sr. Benítez y hacerle un examen de fondo de ojo, no lo mandó a una sala de emergencias de inmediato.[54] El Dr. Pérez testificó que su decisión de no enviar al Sr. Benítez a sala de emergencia fue debido a que no lo había visto en casi cinco (5) años.[55] Por lo tanto, ordenó varios exámenes al entender que una punción lumbar de inmediato podría causar una descompresión rápida y resultar en el fallecimiento del paciente.[56]

Durante su testimonio, el Dr. Taboas aclaró que el 5 de octubre de 2017 no se encontraba en su oficina cuando recibió una llamada al celular de parte del Sr. Benítez. Testificó que en dicha conversación, el Sr. Benítez le dijo que tenía dolor de cabeza y preocupación por su visión.[57] Ante esto, el Dr. Taboas le dijo que acudiera a una sala de emergencias y le hizo una cita para el 10 de octubre de 2017.[58] El Sr. Benítez, por su parte, testificó que no le dijo al Dr. Taboas que tenía pérdida de visión el 5 de octubre de 2017, porque dicho síntoma no surgió hasta que amaneció el 10 de octubre de 2017.[59] Sobre el proceder ante las quejas verbalizadas por el Sr. Benítez al Dr. Taboas, el doctor Enrique Javier Rivera Rivera, perito médico oftalmólogo con especialidad en neuro-oftalmología y glaucoma, testificó que no se podía hacer nada, puesto que "los dolores de cabeza no son señal de una recurrencia de [PTC]. Y ni la intensidad ni la duración de los dolores de cabeza son patognomónicos de una exacerbación de [PTC]".[60] En consecuencia, no pudo llegar a la conclusión médica de que, a base

---

[54] *Íd.*, págs. 245-247.
[55] *Transcripción 21 de junio de 2023*, págs. 99-100.
[56] *Íd.*, pág. 100.
[57] *Transcripción 22 de junio de 2023*, pág. 74.
[58] *Íd.*
[59] *Transcripción 13 de junio de 2023*, págs. 137-140.
[60] *Transcripción 20 de junio de 2023*, pág. 117.

de la información que le proveyó el Sr. Benítez al Dr. Taboas el 5 de octubre de 2017, el paciente estaba teniendo una exacerbación o un desarrollo de un PTC fulminante.[61]

Habiéndose ventilado la prueba durante los nueve (9) días del juicio, el 26 de octubre de 2023, el TPI dictó *Sentencia* en la que declaró No Ha Lugar a la *Demanda* presentada por los Apelantes. Concluyó que "la prueba desfilada y creída por este Tribunal nos convence que ni el Dr. Jiménez ni el Dr. Taboas se apartaron de la mejor práctica de la medicina de la medicina en sus respectivas intervenciones con el Sr. Benítez en este caso".[62] El 10 de noviembre de 2023, los Apelantes presentaron oportunamente una *Moción de Reconsideración y de Determinaciones Adicionales de Hecho y de Derecho* a la que el TPI declaró No Ha Lugar el 29 de noviembre de 2023.

Inconforme con la *Sentencia* del TPI, el 2 de enero de 2024, los Apelantes presentaron la *Apelación* ante nuestra consideración. En esta, presentaron los siguientes señalamientos de error:

1. **ERRÓ EL HONORABLE TPI AL CONCLUIR QUE EL DOCTOR RAFAEL A. TABOAS PÉREZ CUMPLIÓ CON EL MEJOR ESTÁNDAR DE MEDICINA, CUANDO, POR EL CONTRARIO, LA PRUEBA ADMITIDA COMPROBÓ QUE EL DOCTOR TABOAS PÉREZ FUE NEGLIGENTE, INCUMPLIÓ CON EL MEJOR STANDARD DE LA MEDICINA Y CON SU OBLIGACIÓN CON EL DEMANDANTE COMO SU PACIENTE, EVIDENCIADO ESTO, PRINCIPALMENTE, POR EL TESTIMONIO MENDAZ, INCOHERENTE Y CONTRADICTORIO DEL DR. RAFAEL A. TABOAS PÉREZ, EL CUAL FUE IMPUGNADO POR LA PRUEBA DOCUMENTAL Y EL TESTIMONIO DEL DEMANDANTE.**

2. **ERRÓ EL HONORABLE TPI AL CONCLUIR QUE EL DOCTOR JOSÉ F. JIMÉNEZ ROSADO CUMPLIÓ CON EL MEJOR ESTÁNDAR DE LA MEDICINA, CUANDO, POR EL CONTRARIO, LA PRUEBA ADMITIDA COMPROBÓ QUE EL DOCTOR TABOAS PÉREZ FUE NEGLIGENTE, INCUMPLIÓ CON EL MEJOR STANDARD DE LA MEDICINA Y CON SU OBLIGACIÓN CON EL DEMANDANTE COMO SU PACIENTE, EVIDENCIADO ESTO, PRINCIPALMENTE, POR EL TESTIMONIO MENDAZ, INCOHERENTE Y CONTRADICTORIO DEL DR. JOSÉ F. JIMÉNEZ**

---

[61] *Íd.*, pág. 122.
[62] Apéndice, *supra*, Anejo XXXVIII, pág. 647.

**ROSADO, EL CUAL FUE IMPUGNADO POR LA PRUEBA DOCUMENTAL Y EL TESTIMONIO DEL DEMANDANTE.**

3. **ERRÓ EL HONORABLE TPI AL DESDEÑAR INJUSTIFICADAMENTE EL TESTIMONIO HONESTO, RESPALDADO CIENTÍFICAMENTE DEL DR. EDWIN MIRANDA APONTE, PERITO DE LA PARTE DEMANDANTE Y, POR EL CONTRARIO, DARLES CREDIBILIDAD A LOS PERITOS DE LAS DEMANDADAS CUANDO SUS TESTIMONIOS EN EL JUICIO FUERON UNOS EVIDENTEMENTE ACOMODATICIOS, CONFORMADOS PARA SOSTENER UNAS CONCLUSIONES ABSURDAS, QUE NO ESTABAN SOSTENIDAS NI EN DERECHO, NI EN LA PRUEBA.**

## II.

### A.

"[L]a sentencia que dicta un Juez de Primera Instancia es el producto final de un activo y complejo proceso forense". L. Rivera Román, *La apreciación de prueba en el Tribunal de Primera Instancia y en el Tribunal de Apelaciones* en *Perspectivas en la práctica apelativa*, San Juan, Ed. SITUM, 2018, pág. 101. Estas gozan de una presunción de corrección y la parte que impugne una determinación del Tribunal de Primera Instancia tiene el peso de la prueba para refutarla. *Íd.*

En vista de lo anterior, los foros apelativos debemos brindar deferencia a las determinaciones de hechos formuladas por el tribunal de instancia. *Serrano Muñoz v. Auxilio Mutuo*, 171 DPR 717, 740 (2007). Esta deferencia yace en que el foro primario está en mejor posición que un tribunal apelativo para realizar la determinación de credibilidad. *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 771 (2013). Se le impone un respeto a la labor del tribunal de instancia en aquilatar la credibilidad, dado que los foros apelativos sólo poseemos récords mudos e inexpresivos. *Ramírez Ferrer v. Conagra Foods PR*, 175 DPR 799, 811 (2009); *Pérez Cruz v. Hospital La Concepción*, 115 DPR 721, 728 (1984). Pues, en gran medida, la determinación de credibilidad depende de observar la manera en que la persona testigo declara, apreciar sus gestos, titubeos, contradicciones, entre otros factores que van formando

gradualmente la convicción en cuanto a la verdad en la conciencia de la persona juzgadora. *Suárez Cáceres v. Com. Estatal Elecciones*, 176 DPR 31, 67-68 (2009).

Cónsono con lo anterior, la Regla 42.2 de Procedimiento Civil, 32 LPR Ap. V, R. 42.2, dispone que "[l]as determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos". De esta forma, en ausencia de error manifiesto, prejuicio, parcialidad o pasión, los tribunales apelativos no intervendremos con la apreciación de la prueba, la adjudicación de credibilidad ni las determinaciones de hechos efectuadas por el foro primario. *Ortiz Ortiz v. Medtronic*, 209 DPR 759, 778 (2022); *Sucn. Pagán Berrios v. UPR y otros*, 206 DPR 317, 336 (2021); *Santiago Ortiz v. Real Legacy et al.*, 206 DPR 194, 219 (2021).

Se incurre en prejuicio, parcialidad o pasión, cuando la persona juzgadora actúa motivada "por inclinaciones personales de tal intensidad que adopta posiciones, preferencias o rechazos con respecto a las partes o sus causas que no admiten cuestionamiento, sin importar la prueba recibida en sala e incluso antes de que se someta prueba alguna". *Dávila Nieves v. Meléndez Marín, supra*, pág. 782. Además, "el error manifiesto ocurre cuando el foro apelativo queda convencido de que se cometió un error, a pesar de que haya evidencia que sostenga las conclusiones de hecho del tribunal, porque existe un conflicto entre las conclusiones y el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida". *Ortiz Ortiz v. Medtronic, supra*, pág. 779.

De otra forma, únicamente se alterará el dictamen del tribunal de instancia en una circunstancia de error manifiesto cuando, de un examen detenido de toda la prueba, el foro apelativo esté

convencido que la persona juzgadora descartó injustificadamente elementos probatorios importantes o fundó su criterio en testimonios de escaso valor o inherentemente improbables o increíbles. *C. Brewer PR, Inc. v. Rodríguez*, 100 DPR 826, 830 (1972). Por ello, nuestra facultad para sustituir el criterio del foro primario está limitada a las instancias en las que, a la luz de la prueba admitida, no existe base suficiente para apoyar su determinación. *Ortiz Ortiz v. Medtronic, supra.* Por otro lado, los tribunales apelativos nos encontramos en la misma posición del foro primario para evaluar la prueba documental o pericial que fundamentan las determinaciones de hecho. *Sucn. Rosado v. Acevedo Marrero*, 196 DPR 884, 918 (2016); *González Hernández v. González Hernández*, 181 DPR 746, 777 (2011).

**B.**

El valor probatorio de la prueba pericial debe ser analizado según los criterios contenidos en las Reglas de Evidencia de Puerto Rico, 32 LPRA Ap. VI. La Regla 702, por su parte, hace una enumeración no taxativa de los factores a ser considerados para determinar el valor probatorio de un testimonio pericial. Estos son: (1) si el testimonio está basado en hechos o información suficiente; (2) si el testimonio es el producto de principios y métodos confiables; (3) si el testigo aplicó los principios y métodos de manera confiable a los hechos del caso; (4) si el principio subyacente al testimonio ha sido aceptado generalmente en la comunidad científica; (5) las calificaciones o credenciales del perito; y, (6) la parcialidad del perito. Regla 702, *Íd.*; E.L. Chiesa Aponte, *Reglas de Evidencia comentadas*, 2ª ed. rev., San Juan, Ed. SITUM, 2024, pág. 211; *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993); *Frye v. United States*, 293 F. 1013 (D.C., 1923). Su admisibilidad será determinada por el Tribunal conforme a la Regla 403 de Evidencia, *supra.*

En reiteradas ocasiones, los tribunales se han enfrentado con controversias sobre la apreciación de la prueba pericial ofrecida por un perito generalista y uno especializado. "Se dice que un médico puede testificar como perito sobre cualquier rama de la medicina", por lo que su falta de especialidad no es impedimento para su cualificación como perito. E.L. Chiesa Aponte, *op. cit.*, pág. 214. Dicha aseveración está fundada en que:

> El hecho de que el médico en la acción de mala práctica no sea especialista en el campo, no afecta la admisibilidad de su testimonio sino el valor probatorio. Por otro lado, un perito generalista cuenta con las bases intelectuales y de preparación para estudiar a fondo una materia de especialistas y declarar con suficiente grado de confiabilidad y valor probatorio. Después de todo, eso es lo que ocurre en los campos profesionales y científicos, cuando surge una situación novel, se estudia y se concluye con razonabilidad y confiabilidad a base del estudio de los hechos y los principios científicos aplicables.
>
> R. Emmanuelli Jiménez, *Prontuario de derecho probatorio puertorriqueño*, 4ª ed. rev., San Juan, Ed. SITUM, 2015, pág. 441.

Aunque las Reglas de Evidencia "no exige[n] 'especialidad', ésta es de gran peso al estimar el valor probatorio del testimonio pericial". E.L. Chiesa Aponte, *op. cit.*, pág. 215. En *Ríos Ruiz v. Mark*, 119 DPR 816 (1987), el Tribunal Supremo evaluó los testimonios de dos peritos médicos en un caso de impericia en la oftalmología. Como perito de la parte demandante, se presentó a un doctor con especialidad en medicina deportiva; la parte demandada presentó un doctor con especialidad en oftalmología. Aunque el Tribunal no dudó del conocimiento del perito de los demandantes en aspectos de la medicina, reconoció que "[s]u testimonio no demostró el dominio de la oftalmología que se requería en este tipo de caso". *Íd.*, pág. 825. Lo mismo se ha determinado en el caso del testimonio de un perito ingeniero, tanto en los foros estatales como federales. *Díaz v. Pneumatics & Hydraulics*, 169 DPR 273 (2006); *Knight v. Otis Elevator Co.*, 596 F.2d 84, 88 (1st Cir. 1979) ("Venable's inexperience

in the areas of design and manufacturing should go to the weight, and not to the admissibility, of his opinion").

## C.

El récord médico sirve "como instrumento útil para informar con exactitud el cumplimiento de las órdenes del médico, y como fuente de referencia para la evaluación del tratamiento, la atención y cuidado administrado al paciente". *López v. Hosp. Presbiteriano, Inc.*, 107 DPR 197, 216-217 (1978). Este documento constituye la prueba más importante en los casos donde se alega impericia médico-hospitalaria, por lo que el Tribunal Supremo ha reiterado en un sinnúmero de ocasiones la importancia de mantener un récord completo. *Íd.*; *Rodríguez Crespo v. Hernández*, 121 DPR 639 (1988); *Cruz v. Centro Médico de PR*, 113 DPR 719 (1983). "Hemos sido consistentes en cuanto a valorizar la importancia de llevar unos récords médicos adecuados. Aun cuando las omisiones en los récords médicos no necesariamente constituyen negligencia per se, dicha omisión puede ser un factor a considerarse en la credibilidad que el médico merezca respecto al tratamiento que dio al paciente". *Rodríguez Crespo v. Hernández, supra*, pág. 661. Su importancia no tan solo recae sobre su valor como prueba ante los tribunales, sino un récord médico completo y adecuado protege al paciente. *Reyes v. Phoenix Assurance Co.*, 100 DPR 871, 880 (1972). El récord médico, por constituir prueba, podrá ser impugnado conforme con lo dispuesto en la Reglas de Evidencia, *supra*.

## D.

En los casos de impericia médica, es menester que la parte demandante demuestre, mediante la ventilación de la prueba, que los médicos demandados se apartaron del *standard of care* en el diagnóstico y tratamiento del paciente. Dicho sea de paso, que la acción por negligencia médico-hospitalaria surge del Artículo 1536 del Código Civil, 31 LPRA sec. 10016 (antiguamente el Artículo 1802

del Código de 1930). No obstante, para prosperar en la acción, no basta con probar los elementos clásicos de una causa por responsabilidad extracontractual. Nuestro Tribunal Supremo, mediante jurisprudencia, ha desarrollado que la parte demandante debe establecer, mediante prueba: (1) las normas mínimas de conocimiento y cuidado médico aplicables a los generalistas o a los especialistas; (2) que el demandado incumplió con estas normas en el tratamiento del paciente; y, (3) que esto fue la causa del daño sufrido por el paciente. C. Zeno Santiago, *La responsabilidad civil extracontractual acorde con el Código Civil de Puerto Rico de 2020 y la jurisprudencia puertorriqueña,* 1ª ed. rev., San Juan, 2024, pág. 140; *Arrieta v. Dr. de la Vega,* 165 DPR 538 (2005) (Per Curiam); *Medina Santiago v. Vélez,* 120 DPR 380, 385 (1988).

Como defensa, los médicos pueden levantar la duda educada y razonable sobre el curso a seguir en el diagnóstico y tratamiento del paciente. "[A]l médico se le reconoce amplia discreción profesional en su trabajo y que no es responsable de impericia cuando se enfrenta a una situación en la cual cabe duda educada y razonable sobre cuál debe ser el curso a seguir". C. Zeno Santiago, *op. cit.,* pág. 140. Dicha discreción es tan amplia, que nuestro Tribunal ha reconocido una presunción rebatible de corrección a favor de la conducta del médico en el diagnóstico y tratamiento. *Rodríguez Crespo v. Hernández, supra.* "Para rebatir esta presunción, la parte demandante no puede descansar en una mera posibilidad de que el daño se debió al incumplimiento por parte del médico de su obligación profesional". C. Zeno Santiago, *op. cit.,* págs. 146-147. "Un médico no puede garantizar un resultado favorable en toda intervención". *Íd.*, pág. 147. Por lo tanto, el Tribunal Supremo ha reconocido como defensa el error de juicio en el diagnóstico.

El error de juicio en el diagnóstico es una defensa cuando exista una de las siguientes circunstancias: (1) una duda razonable

sobre la condición o enfermedad del paciente; (2) que las autoridades médicas reconocidas estén divididas en cuanto a cuál debe ser el procedimiento del diagnóstico que ha de seguirse; o, (3) que el diagnóstico se haga después de un esfuerzo concienzudo del médico para enterarse de los síntomas y la condición del paciente. *Oliveros v. Abreu*, 101 DPR 209, 227 (1973). En su esfuerzo de enterarse de los síntomas y condición del paciente, el médico debe emplear la doctrina del diagnóstico diferencial. Esta "está basada en la exigencia de un procedimiento para distinguir entre posibles padecimientos que requieren tratamientos diferentes y específicos". *Lozada v. E.L.A.*, 116 DPR 202, 217 (1985).

En *Arrieta v. Dr. de la Vega, supra,* el Tribunal Supremo aplicó la doctrina del error de juicio en el diagnóstico. Concluyó que aunque los médicos erraron en diagnosticar a la paciente correctamente, dicho error surgió luego de un esfuerzo holístico para diagnosticarla. No abandonaron a la paciente, realizaron diagnósticos diferenciales y consultaron con especialistas para atender a la paciente. Dicha conclusión refleja la doctrina aplicada en *López v. Dr. Cañizares*, 163 DPR 119 (2004), donde el Tribunal sostuvo que "no incurre en responsabilidad profesional el médico que, ante las circunstancias particulares del caso ante sí, utiliza su buen juicio profesional a la luz de los criterios de razonabilidad y aceptación del sector médico". *Íd.*, pág. 134.

**III.**

Como cuestión de umbral, debemos resaltar nuevamente que nuestra revisión no constituye una oportunidad para que las partes presenten evidencia nueva ni relitiguen sus casos. Las partes tuvieron la oportunidad para hacerlo ante el TPI que, por su parte, hizo las determinaciones de hecho y conclusiones de derecho a base de la prueba ventilada y creída. De esta forma, en ausencia de error manifiesto, prejuicio, parcialidad o pasión, los tribunales apelativos

no intervendremos con la apreciación de la prueba, la adjudicación de credibilidad ni las determinaciones de hechos efectuadas por el foro primario. Ahora bien, al momento de revisar las determinaciones de hecho y conclusiones de derecho provenientes de un testimonio pericial, el Tribunal Supremo ha resuelto que los foros apelativos están en la misma posición que los tribunales de instancia para imponer nuestro criterio sobre aquel testimonio.

Aclarado nuestro marco revisor, nos encontramos en posición para resolver los errores señalados por la parte apelante. En síntesis, los Apelantes alegan que el TPI erró al determinar que los doctores Jiménez y Taboas se apartaron de las mejores prácticas de la medicina moderna y del *standard of care* aplicable. Según los Apelantes, dichos actos de impericia ocurrieron en dos momentos durante el diagnóstico y tratamiento del Sr. Benítez: (1) el 2 de octubre de 2017, cuando el Sr. Benítez acudió por primera vez a la Sala de Emergencias del Hospital Pavía y fue atendido por el Dr. Jiménez; y, (2) el 5 de octubre de 2017, cuando el Dr. Taboas no refirió al Sr. Benítez de inmediato a una sala de emergencias luego de recibir su llamada desde la oficina del Dr. Pérez. Finalmente, los Apelantes también alegan que el TPI erró al no darle valor probatorio al testimonio del Dr. Miranda, perito de la parte apelante-demandante. Por estar íntimamente relacionados, estaremos atendiendo los errores en conjunto, comenzando con el error señalado relacionado con el testimonio del Dr. Miranda.

El Dr. Miranda ofreció su testimonio e informe pericial en cuanto a la conducta de los doctores demandados y concluyó, según su opinión y experiencia como médico especializado en medicina general y sala de emergencias, que estos se apartaron del *standard of care* aplicable. Dichas conclusiones estuvieron basadas en el récord médico de los doctores y en la narrativa que le hizo el demandante, Sr. Benítez. En primer lugar, dejamos claro que no

existe duda sobre la pericia del Dr. Miranda en asuntos relacionados con la medicina general y salas de emergencias. De su currículo y testimonio, se desprende que el Dr. Miranda está altamente cualificado para ofrecer testimonio experto en casos de impericia médica. No obstante, al igual que concluyó el TPI, somos de la opinión que el Dr. Miranda tiene un *expertise* limitado sobre el diagnóstico y tratamiento del PTC y papiledemas. Si bien han resuelto los tribunales que un médico puede ser calificado como perito para discutir cualquier rama de la medicina, la especialidad del médico podrá tener un efecto sobre el valor probatorio de aquel testimonio.

Por otro lado, el Dr. Miranda testificó que al preparar su informe pericial, le dio mayor peso a la narrativa del Sr. Benítez, sobre el récord médico de los doctores. Ahora bien, el récord médico no tiene que ser una prueba que este valorizada sobre toda otra prueba presentada, pero sí constituye la prueba más completa para, con exactitud, determinar el cumplimiento de las órdenes del médico, y sirve como fuente de referencia para la evaluación del tratamiento, la atención y cuidado administrado al paciente. Por lo tanto, sustentar sus determinaciones mayormente en la narrativa del Sr. Benítez no es fatal de por sí para el informe pericial del Dr. Miranda. No obstante, en su apreciación de la prueba, el TPI le restó credibilidad al testimonio del Sr. Benítez al detectar inconsistencias en el mismo.

En cuanto a su interacción con el Dr. Taboas, el Sr. Benítez testificó que el 5 de octubre de 2017, sufría de problemas con la visión y se lo notificó al Dr. Taboas en su llamada. No obstante, durante su testimonio, reconoció que los problemas con la visión no surgieron hasta la madrugada del 10 de octubre de 2017. Además, había incluido en su narrativa que el Dr. Taboas no lo refirió de inmediato a una sala de emergencias el 5 de octubre de 2017, pese

él haberle informado al doctor de sus síntomas. El Dr. Taboas, por su parte, testificó que él lo refirió al Dr. Pérez y a una sala de emergencias. Por otro lado, la parte apelante intentó establecer que hubo impericia por parte del Dr. Taboas al no atenderlo ese mismo, 5 de octubre, o, en su defecto, citarlo para el 9 de octubre de 2017. La realidad es que quedó probado que el Dr. Taboas no se encontraba en sus oficinas el 5 de octubre de 2017, porque estas estaban cerradas debido a las medidas de seguridad impuestas por el dueño del edificio tras el paso del Huracán María. Finalmente, el Dr. Rivera, perito médico de la parte apelada, calificado como perito Oftalmólogo con especialidad en Neuro-Oftalmología, testificó que en cuanto al *standard of care* de la PTC, a diferencia de otras condiciones como un derrame, la taquicardia supraventricular o un infarto, no existen unas guías establecidas o un estándar para el manejo agudo de la condición.

El diagnóstico y tratamiento de un paciente es un trabajo complicado en persona y aún más complicado mediante teléfono, sin contar con los beneficios de unos récords médicos, exámenes o equipo médico necesario. De la prueba ventilada y creída, se estableció que el Dr. Taboas no se encontraba en sus oficinas cuando el Sr. Benítez lo llamó el 5 de octubre de 2017. No obstante, el paciente se encontraba en las oficinas del Dr. Pérez, quien lo evaluó. El Dr. Taboas desconocía de esta información. Cabe destacar, que el Dr. Pérez tuvo la oportunidad de realizar los exámenes y evaluaciones correspondientes a los síntomas que presentó el Sr. Benítez. Entre los exámenes realizados, el Dr. Pérez le realizó un examen de fondo de ojo. No obstante, no pudo diagnosticar la existencia de papiledema.

En el caso del Dr. Jiménez, los Apelantes alegaron impericia al doctor no haber diagnosticado correctamente al Sr. Benítez el 2 de octubre de 2017, cuando este visitó la Sala de Emergencias del

Hospital Pavía. Durante su turno de prueba, los Apelantes intentaron impugnar el récord médico. Alegaron que el Dr. Jiménez no anotó el historial médico del Sr. Benítez pese este haberle informado del mismo. Nuevamente, el TPI se enfrentó con un problema de credibilidad entre el testimonio del Dr. Jiménez y el del Sr. Benítez, y nuevamente le restó credibilidad al testimonio del Sr. Benítez. Durante el contrainterrogatorio, el Sr. Benítez testificó que el Dr. Jiménez le hizo las preguntas del historial médico y síntomas presentes. También se las realizó el personal médico presente durante el *Triage*. No obstante, tanto del récord del Dr. Jiménez como aquel del *Triage*, no surge que el Sr. Benítez haya informado su diagnóstico previo de PTC. Además, en el proceso del diagnóstico, el Dr. Jiménez ordenó que se le realizaran varios laboratorios y exámenes al Sr. Benítez, incluyendo un CT Scan, hemograma, PT-PTT, el INR y un perfil metabólico que salieron todos normales.

Tras revisar las transcripciones de los días de juicio, los argumentos de las partes y la prueba documental presentada, no surge que el TPI haya cometido una evaluación errónea de la prueba presentada, ni cometido error manifiesto, ni actuado con prejuicio ni con parcialidad. Por otro lado, como ya hemos señalado, el testimonio que ofreció el Dr. Miranda, basado principalmente en una narrativa de valor probatorio dudoso, carece de credibilidad ante el testimonio pericial presentado por la parte apelada. Por lo tanto, confirmamos la *Sentencia* que dictó el TPI al entender que no se cometieron los errores señalados.

**IV.**

Por los fundamentos discutidos, confirmamos la *Sentencia* del TPI.

Lo acordó y manda el Tribunal y lo certifica la Secretaria.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones